Myron **COHEN** and Helen Freedman on behalf of themselves, and all others similarly situated, Plaintiffs,

v.

**PRICE COMMISSION** et al., Defendants.

No. 72 Civ. 53.

United States District Court,
S. D. New York.

Jan. 24, 1972.

Hubbell, Cohen & Stiefel, New York City, for plaintiffs; Myron Cohen, Sheldon Palmer, Helen E. Freedman, Maurice B. Stiefel, of counsel.

Whitney North Seymour, Jr., U. S. Atty. for the S. D. N. Y., New York City, for defendant Price Commission; Steven J. Glassman, Asst. U. S. Atty., of counsel.

John G. de Roos, Gen. Counsel, New York City Transit Authority, Brooklyn, N. Y., for defendants Metropolitan Transp. Administration, New York City Transit Authority, Manhattan and Bronx Surface Transportation Operating Authority, and Triborough Bridge and Tunnel Authority; Helen R. Cassidy, James P. McMahon, Brooklyn, of counsel.

EDWARD WEINFELD, District Judge.

Plaintiffs, having commenced this action to declare void, upon various speci-

fied grounds an order of the defendant Price Commission (hereafter Commission) which authorized a five-cent fare increase on subway and bus lines, toll increases on bridges and tunnels, and increases for parking charges, move to enjoin the other defendants, public benefit agencies, during the pendency of this action, from collecting fares and tolls in excess of those collected on December 31, 1971. The plaintiffs have confined their instant motion for preliminary injunctive relief to the sole ground that the order of the Commission is void for noncompliance with the requirements of the National Environmental Policy Act of 1969 (NEPA),[1] its policies and goals. They acknowledge that, as to the other grounds of attack upon the Commission's order, they have not submitted at this time sufficient evidence to sustain their plea for injunctive relief.

The main thrust of plaintiffs' attack is that the authorized increase in subway and bus fare will substantially increase motor vehicle traffic on the streets of New York City and significantly accelerate the level of air pollution, resulting in serious harm to the health and well being of those who live and work in New York City. The plaintiffs charge, upon information and belief, that none of these environmental matters were presented to, or considered by, the Commission, which, they contend, it was obligated to do under the Act.

The application for the authorized increases was filed with the Commission on December 27, 1971, and essentially was based upon economic factors—losses and heavy deficits incurred in the operation of New York City transit facilities, the prospect of still further losses, so that if relief were not granted, serious hardship would ensue to "the six and one half million daily riders who use Transit Authority and [other] mass transportation facilities and to the more than 300,000 daily commuters using MTA

[Metropolitan Transit Authority] facilities."[2] The application was detailed and extensive, setting forth significant information as to revenues, losses, operations and alternative sources of funds for maintaining subway and bus fares as low as possible, including the proposal to help subsidize mass transit by the revenues derived from increased tolls on bridges and tunnels and charges for parking facilities. The information presented to the Commission indicated a projected operating deficit for the calendar year 1972 of $177.5 million, exclusive of an anticipated wage increase for transit employees, then the subject of unresolved collective bargaining negotiations. It was estimated that a 5.5% increase in hourly rates would add $30.3 million to operating costs, thereby substantially increasing the projected deficit. The fare increase, if granted, was anticipated to yield $85 million per year, still leaving a wide gap to be made up by other sources. The application concluded:

"It is urgently necessary that the approval and exception herein requested be granted at the earliest possible date. As indicated above, the Transit Authority has been operating for a long period at a substantial deficit. Its cash position is critical, and it would be unable to meet payrolls in January 1972 unless relief is granted. Furthermore, any delay in collecting the increased fares and tolls will result in a loss in revenue of approximately $2½ million a week. A delay would therefore seriously handicap the Transit Authority's ability to operate at a thirty-five cents' fare."[3]

On January 4, 1972, the Commission, after consideration of the application, granted approval of the requested increases. It noted that its approval of the subway and bus increases was "based on the fact that the subways and busses have been operating at loss and that a

1. 42 U.S.C. §§ 4321–4347.
2. Letter of William J. Ronan in application to Price Commission, December 27, 1971, Exhibit A to Glassman affidavit.
3. Letter of William J. Ronan to Price Commission, December 21, 1971, Exhibit A to Glassman affidavit.

loss is projected for the calendar year 1972."[4] The Commission further specified that its approval was made on the basis of (1) the presumed validity of the supporting data, and (2) the Commission's consideration of other relevant factors. In authorizing the bridge and tunnel increases, the Commission determined that "the continued operation of a mass transit system at subsidized fares helps reduce traffic congestion, thus benefiting users of bridges and tunnels, and lessens air pollution . . . ."[5]

The authorized increases were put into effect on January 4. Plaintiffs filed this suit on January 6 and sought a temporary restraining order which, however, was denied by Judge Pierce. Thereafter the instant motion for preliminary injunctive relief was argued before this court on January 11.

The hard core of plaintiffs' claim here under consideration is that the Commission's action authorizing the fare increase will effect a loss of passengers on mass transit lines, a percentage of whom will resort to motor vehicles to reach their destination, with the result that an additional 21,000 motor vehicles will come into the central business district of New York City each day,[6] thereby increasing air pollution to the extent that the federally mandated safe air standards, which must be met by 1975, may be jeopardized—that the Commission's order is void in that it failed to include a detailed statement on the environmental impact of the proposed fare and toll increases, failed to consult or obtain the view of other federal agencies, and otherwise failed to comply with the mandate of NEPA.

■ In order to obtain the drastic preliminary relief, which, if granted at this juncture of the litigation, would prevent the defendant authorities from collecting the authorized increases and thus yield to plaintiffs the ultimate and permanent relief to which they would be entitled only after a trial upon the merits, they bear a heavy burden. It is familiar teaching that a preliminay injunction should be granted only upon a clear showing by a party seeking the extraordinary remedy (1) of probable success upon a trial on the merits, and (2) likely irreparable injury to him unless the *injunction is granted, or* (3) *if his* showing of probable success is limited but he raises substantial and difficult issues meriting further inquiry, that the harm to him outweighs the injury to others if it is denied.[7] As to none of

---

4. Letter of C. Jackson Grayson to William J. Ronan, January 4, 1972, Exhibit B to Glassman affidavit.

5. Letter of Bert Lewis to William J. Ronan, January 4, 1972, Exhibit C to Glassman affidavit.

6. The area south of 60th Street.

7. Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190 (2d Cir., 1971) ; Weiss v. Walsh (2d Cir., Oct. 29, 1971) ; Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205–1206 (2d Cir., 1970) ; Clairol Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir., 1968) ; Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840, 841 (2d Cir., 1967) ; Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir., 1966) ; Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204–205 (2d Cir., 1966) ; Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir., 1966) ; H. E. Fletcher Co. v. Rock of Ages Corp., 326 F.2d 13, 17 (2d Cir., 1963) ; Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2d Cir., 1953).
In this Circuit, the rule on applications for preliminary injunctive relief has recently been formulated in these terms:

"The purpose of a preliminary injunction is to maintain the status quo pending a final determination of the merits . . . . It is an extraordinary remedy, and will not be granted except upon a clear showing of probable success *and* possible irreparable injury . . . . However, 'the burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief.' . . . In such a case, the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation." Checker Motors

these elements have the plaintiffs made the necessary showing.

The first, a clear showing of probable ultimate success necessarily rests upon plaintiffs' contention that the Commission was bound to conform to the requirements of the Environmental Policy Act. The Commission, appointed by the President, functions under the Economic Stabilization Act of 1970,[8] as amended in 1971,[9] which authorizes the President to issue such orders and regulations as he deems appropriate to stabilize prices, rents, wages and salaries. Its central purpose, as the Act itself makes clear, is to stabilize the economy, reduce inflation, minimize unemployment, protect the purchasing power of the dollar and improve the nation's competitive position in world trade.[10] And the Act emphasizes that "the adjustments necessary to carry out this program require prompt judgments and actions by the executive branch of the Government. The President is in a position to implement promptly and effectively the program authorized by this title." [11] The President's functions to carry out the purposes of the Act were delegated to the Price Commission. There can be no question that if the purposes of the Economic Stabilization Act are to be achieved, the President or his delegated representatives must be free to act with promptness and dispatch.

NEPA, on the other hand, begins with a congressional declaration of long range national environmental policy—". . . the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." [12]

Plaintiff, in urging that the Commission is subject to NEPA, relies upon its "action-forcing" provision,[13] which provides, inter alia:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

.   .   .   .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

8. Pub.L. No. 91–379, 84 Stat. 799.

9. Economic Stabilization Act Amendments of 1971, Pub.L. No. 92–210, 85 Stat. 743.

10. Economic Stabilization Act Amendments of 1971, Pub.L. No. 92–210, 85 Stat. 744.

11. *Id.*

12. 42 U.S.C. § 4331(a).

13. 42 U.S.C. § 4332.

The plaintiffs contend that the authorized increases are "major Federal actions significantly affecting the quality of the human environment," which not only required a detailed statement by the Commission on the environmental impact of the authorized increases, but further that before making such a detailed statement it was obligated to "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." [14] The defendants dispute that the Commission's order permitting the increase was "a major Federal [action] significantly affecting the quality of the human environment," or that in allowing a discretionary price increase or exception under the economic stabilization program Congress intended the Commission either to file a detailed statement as to environmental factors or that before doing so it solicit the views of other federal agencies on that subject.

Whatever the differing views of the litigants, a fair reading of the provisions of NEPA and the Economic Stabilization Act, and their respective basic purposes indicates a substantial question as to whether NEPA is applicable to the Price Commission—a temporary agency and one intended to act upon matters within its authority with dispatch—whose function would readily be defeated and frustrated by bureaucratic delays were it required to solicit the judgment of other federal agencies in evaluating the environmental benefits or detriments that may be involved in its determination of prices and wages.

NEPA itself indicates it centers about long range policy considerations affecting "present and future generations of Americans," suggesting a concern with permanent governmental agencies engaged in policy-making decisions or whose administrative determinations, ofttimes involving government funding of various projects of a permanent nature, are likely to have an environmental impact. NEPA is concerned with the use of environmental information in "planning and decisionmaking." [15] particularly as applied to the licensing functions of independent agencies and the ongoing activities of regular federal agencies.[16] The Guidelines proposed by the Council on Environmental Quality for procedures under NEPA evidence recognition of the prolonged decisionmaking process contemplated by NEPA and the extensive nature of the review.[17] For example, no less than ninety days is to elapse between the circulation for comment of a draft environmental statement and administrative action.[18]

The Price Commission is a temporary agency whose existence is scheduled to end midnight, April 30, 1973. It is doubtful, to say the least, that Congress intended such an agency, which perforce, if it is to function effectively must act expeditiously, be required before authorizing an increase in the price of a loaf of bread, a bottle of milk, a can of beer, a gallon of gasoline or a ton of steel, not only to make a determination of the environmental impact of its proposed action, but also to consult with and to obtain the views of other federal agencies

14. 42 U.S.C. § 4332.

15. *See* 42 U.S.C. § 4332. *See also* S.Rep. No.91–296, 91st Cong., 1st Sess. 8–9 (1969).

16. *See* S.Rep.No.91–296, 91st Cong., 1st Sess. 14 (1969); Hanks & Hanks, An Environmental Bill of Rights: The Citizen Suit and the National Environmental Policy Act of 1969, 24 Rutgers L.Rev. 230, 252–53 (1970).

17. *See* 36 Fed.Reg. 7724 (1971), reprinted in 1 Environmental L.Rep. 46049–46065;

cf. Greene County Planning Bd. v. FPC, 455 F.2d 412 (2d Cir., 1972). The Council, established under Subchapter II of NEPA, 42 U.S.C. §§ 4341–4347, has been assigned a number of functions, including the review and appraisal of programs adopted by other governmental agencies to determine the extent to which such programs contribute to achieving the policies of the Environmental Act.

18. Guidelines § 10(b), 36 Fed.Reg. 7726 (1971).

with respect thereto and, pending receipt of such views, withhold determination for at least ninety days, with the consequent delay. Such procedural restrictions would seemingly be at odds with Congress' announced purpose that the successful implementation of the Stabilization Act required "prompt judgments and actions by the executive branch . . ." and its recognition that "[t]he President is in a position to implement promptly and effectively the [Stabilization] program . . ."[19] and may well render impossible the achievement of that program.[20] Further evidence that Congress intended no hindrance to expeditious action is the fact that it freed the Commission of the normal requirements of the Administrative Procedure Act[21] and limited the powers of the courts to issue injunctive relief.[22] The doubt engendered as to the applicability of NEPA to the Commission poses a substantial initial barrier to plaintiffs' success upon the trial. The cases relied upon by plaintiffs, upon their facts and because of the nature of the agencies involved, are inapposite and do not remove the doubt.[23]

■ A further obstacle exists to plaintiffs' likelihood of success. Defendants, without retreating from their basic position, contend that in fact the Commission, although not required to, did take into account environmental considerations, pointing out that its order was based specifically upon a determination that "the continued operation of a mass

transit system at subsidized fares helps reduce traffic congestion, thus benefiting users of bridges and tunnels, and lessens air pollution . . . ." While it is not contended that the Commission, prior to its determination, prepared a detailed statement of the environmental consequences of its proposed action or submitted it for appropriate consideration by other federal agencies for a period of not less than ninety days, the Guidelines promulgated under NEPA clearly recognize that there may be emergency situations where the public interest requires immediate and prompt action.[24] Each week that the proposed price increase was delayed would have endangered the continued viability of New York City's mass transit system and brought the City closer to total paralysis.

■ Finally, on the issue of likelihood of success, another factor of substance appears to militate against the plaintiffs —their failure to exhaust available administrative remedies. Section 300.56 of the Price Commission Regulations[25] prescribes procedures for the submission of information on price increases by persons not immediate parties to the filing. Plaintiffs here, who appear to have had a special interest in the city's transit problem and had available to them much data pertinent to their contentions, made no submission of any kind to the Commission, nor did they request review of the Commission's order as the Regulation permits. This alone may eventually bar success.

19. *See* Economic Stabilization Act Amendments of 1971, § 202, Pub.L. No. 92–210, 85 Stat. 744.

20. *Cf.* Calvert Cliffs' Coordinating Comm., Inc. v. AEC, 449 F.2d 1109, 1115 (D.C. Cir. 1971).

21. *See* Economic Stabilization Act Amendments of 1971, § 207(a), Pub.L. No. 92–210, 85 Stat. 747.

22. *See id.* § 211(d), 85 Stat. 749. However, the Amendments clearly give federal district courts original and exclusive jurisdiction over cases or controversies arising thereunder. *Id.*, § 211(a), 85 Stat. 748.

23. For example, in Scenic Hudson Preservation Conf. v. FPC, 453 F.2d 463 (2d Cir., 1971) ; Calvert Cliffs' Coordinating Comm., Inc. v. AEC, 449 F.2d 1109 (D.C. Cir., 1971), and most recently in Greene County Planning Bd. v. FPC, 412 F.2d 455 (2d Cir., 1972), the agencies involved were engaged in extensive planning involving physical projects whose construction had obvious environmental impact and where promptness was not a sine qua non of the agencies' effectiveness.

24. *Cf.* Guidelines § 10(d), 36 Fed.Reg. 7726 (1971) ; Calvert Cliffs' Coordinating Comm., Inc. v. AEC, 449 F.2d 1109, 1122 (D.C.Cir., 1971).

25. 36 Fed.Reg. 23980 (1971).

Second, the claim of irreparable injury is based upon the contention, as already noted, that the end result of the Commission order will bring upon the streets of New York City and its environs increased motor vehicles with a resulting increase in air pollutants, thereby endangering the health of its citizens. Plaintiffs' claim here is postulated upon expert opinion, which, in turn, is based upon experience with prior fare increases, far more substantial than the instant one, which resulted in extensive passenger losses on the bus and subway lines, which loss in part was compensated for by passenger use of automobiles; they brush off as only minimal the likely restraining impact on additional motor usage by reason of the increased bridge and tunnel tolls.[26] The claim has elements of conjecture and is far from persuasive. At the outset, plaintiffs acknowledge that air pollution in our city, even prior to the fare increase, was far from ideal—indeed, far from standard. Thus, they tell us that "as each person walks into this Courthouse on any given business day, he is likely to breathe air that has five times the safe amount of carbon monoxide mandated by the Federal Government and forty times the safe amount of hydrocarbon. . . . The single major contributor to this threat to life is the motor vehicle."[27] The contention is that the estimated additional 21,000 vehicles in the central business district allegedly resulting from the fare increase [28] will further degrade the quality of the air, and that the present pollution level will be increased in the case of carbon monoxide by 5%, hydrocarbons by approximatey 4½% and nitrogen oxides by 4%.[29] As noted, the experts' conclusion of the inevitability of increased motor vehicle usage rests upon the results of prior fare increases. However, in those instances there was no accompanying increase in the tariff for the use of bridges and tunnels. Here, while the bus and subway fares are increased 16⅔%, the bridge and tunnel toll charges have been increased substantially more—in most instances, 100%, and in some as high as 150%. These substantial increases for vehicles using those bridges and tunnels, upon its face, are a countervailing force for those passengers who normally would give up riding on the subway and busses because of the fare increase, and this factor would tend to reduce rather than increase vehicular traffic coming into the city. Thus, plaintiffs' factual allegation of irreparable injury because of increased health hazards due to increased air pollution rests on a slender reed. Conjecture is piled upon conjecture. Perhaps a further study based upon demonstrated experience of the results of the fare and toll increases may give support to their claim, but at this point they have failed to make that strong showing of irreparable injury essential to a grant of preliminary relief.

And for the same reason they fail on the next score. Assuming plaintiffs have "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation,"[30] the balance of hardship tips decidedly towards defendants. The application upon which the Commission acted showed that the bus and subway system had been operating over a long period at substantial deficits, and, as stated, "its cash position is critical, and it would be unable to meet

---

26. The study, relied upon by plaintiffs to discount the effect of such increases, admits:
"The following pages do not set forth the results of an exhaustive study, but they 'size up' the volume, patterns and other characteristics of regional . . . travel to Manhattan." Tri-State Regional Planning Commission, Regional Pro-file: Subway Riders and Manhattan Autos 1 (1971).

27. Brief for Plaintiffs at 2.

28. Arrow affidavit at ¶ 15.

29. Ketcham affidavit at ¶ 14.

30. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir., 1953).

payrolls in January 1972 unless relief is granted."[31]  To halt the increase now in light of the continuing operating deficits, now further increased by the consummation of the recent collective bargaining agreement, would create a hazardous financial situation, with uncertainty as to the continued operation of the city's mass transit system.  Whatever justifiable complaints the public now has to the operation of the bus and subway lines would be increased.  The hardship imposed upon the millions of riders by a stoppage, or even curtailment of services would far outweigh any claimed injury to plaintiffs or those they claim to represent.

See also, 5 Cir., 458 F.2d 9.

This opinion, holding that plaintiffs are not entitled to a preliminary injunction, means no more than that they have failed to sustain their heavy burden of proof.  The motion for a preliminary injunction is denied.

---

31.  Letter of William J. Ronan in application to Price Commission, December 27, 1971, Exhibit A to Glassman affidavit.