STUDENTS CHALLENGING REGULA-TORY AGENCY PROCEDURES (S. C. R. A. P.), Plaintiff,

and

Council On Environmental Quality, Involuntary Plaintiff,

and

Environmental Defense Fund et al., Plaintiffs-Intervenors

v.

The UNITED STATES of America and The Interstate Commerce Commission, Defendants,

and

The Aberdeen and Rockfish Railroad Company et al., Defendants-Intervenors.

Civ. A. No. 971-72.

United States District Court, District of Columbia.

July 10, 1972.

Peter H. Meyers and John F. Banzhaf, III, Washington, D. C., for plaintiff.

Scott H. Lang and John F. Dienelt, Washington, D. C., for plaintiffs-intervenors.

William M. Cohen, Atty., Department of Justice, for defendant United States of America.

Fritz R. Kahn, General Counsel, and James F. Tao, Atty., Interstate Commerce Commission, for defendant Interstate Commerce Commission.

Charles A. Horsky, Michael Boudin and James L. Tapley, Washington, D. C., Edward A. Kaier, Philadelphia, Pa., T. A. Miller, San Francisco, Cal., and Albert B. Russ, Jr., Richmond, Va., for defendants-intervenors.

Before WRIGHT, Circuit Judge, and RICHEY and FLANNERY, District Judges.

J. SKELLY WRIGHT, Circuit Judge:

This case is before us on plaintiff's motion for a preliminary injunction and defendant's cross-motion to dismiss.[1] It presents important issues concerning the applicability of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* (1970), to agency rate making procedures. More broadly, it tests once again our commitment "to use all practicable means and measures * * * in a manner calculated to * * * create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331.

Plaintiff Students Challenging Regulatory Agency Procedures (SCRAP) is an unincorporated association concerned with enhancing the quality of the human environment for its members. SCRAP seeks temporary and permanent relief against Interstate Commerce Commission orders of February 1, 1972 and April 24, 1972 issued in conjunction with Ex Parte 281, Increased Freight Rates and Charges, 1972. These orders permit, with certain exceptions, the nation's railroads to attach a 2.5 per cent surcharge to the normal tariff on all freight shipped until November 30, 1972. The theory of the suit is that this across-the-board increase boosts the cost of shipping recyclable materials and aggravates the preexisting disparity in shipping costs between these materials and the primary goods with which they compete. Plaintiff alleges that this price increase will discourage the environmentally desirable use of recyclable goods and that, hence, the Commission orders are "major Federal actions significantly affecting the quality of the human environment" which, under the terms of NEPA, cannot take effect before a "detailed statement * * * on * * * the environmental impact of the proposed action" is prepared. 42 U. S.C. § 4332(2) (C).[2]

---

1. We also have before us plaintiff's motion to consolidate this case with SCRAP v. United States, Civil Action No. 806–72, and defendants' opposition thereto. We have decided, however, to defer action on this motion until such time as we reach the merits of Civil Action No. 971–72.

2. 42 U.S.C. § 4332 provides in relevant part:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \* \* \*

In response, defendants raise a number of procedural and substantive objections. They attack plaintiff's standing to raise these issues and the court's jurisdiction to decide them. On the merits, they argue that the Commission's orders are not "major Federal actions significantly affecting the quality of the human environment" and that NEPA was never intended to apply to situations such as this. Finally, they contend that even if plaintiff's suit is not dismissed a proper balancing of the equities precludes an award of preliminary relief at this time.

For the reasons given below, we reject each of these contentions. We hold that plaintiff is entitled to a preliminary injunction against implementation of the ICC's April 24 order permitting an extension of the 2.5 per cent surcharge until November 30, 1972.[3] We further hold that the Commission should be preliminarily enjoined from permitting the railroads to collect the surcharge until an adequate environmental impact statement has been issued. However, in light of the fact that plaintiff objects to the surcharge only insofar as it increases the shipping costs of recyclable materials, we are restricting our injunction to the movement of these goods. The rail-

roads will be permitted to continue exacting the 2.5 per cent surcharge on the movement of all goods which are not being transported for purposes of recycling.

## I. The Facts

The Interstate Commerce Act permits carriers to file changes in tariffs with the Commission on their own initiative. If the Commission takes no action on these tariffs, they go into effect as published, although subject to eventual refund if the Commission ultimately finds them unjust or unreasonable. However, the Commission may, if it chooses, suspend the new tariffs for a period of up to seven months while it investigates them. If the Commission finds the rates unreasonable, it may replace them with Commission-made rates. But if the Commission has not completed its investigation in the seven-month period, the suspension is automatically lifted and the carrier-made rates go into effect, although again subject to refund if the Commission finds them unreasonable in its final order. *See* 49 U.S.C. § 15 (1970).

Pursuant to this scheme, the railroads filed a petition on December 13, 1971 requesting permission to file on short no-

---

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which

has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes[.]

3. Although plaintiff also seeks an injunction against the Commission's Feb. 1 order which first permitted the 2.5% surcharge to take effect, that order expired under its own terms on June 5. We are therefore dismissing this portion of plaintiff's complaint as moot—without prejudice, however, to any actions brought by individual shippers under 49 U.S.C. § 13 (1970) to recover excess charges.

tice a surcharge of 2.5 per cent on freight rates effective January 1, 1972. On December 21, 1971 the Commission issued a report and order in which it delayed the new rates, announced that it was undertaking an investigation of the adequacy of shipping rates, and stated that it would permit the railroads to republish their proposal for the 2.5 per cent surcharge to be effective no earlier than February 5, 1972. *See* 340 ICC 358.[4]

In accordance with this order, the railroads refiled the proposed surcharge on January 5, 1972 with a provision that it become effective on February 5. Thereupon, on February 1, the Commission issued the first of the orders attacked by SCRAP. The Commission found that "the increases here proposed are just and reasonable" and that "the involved general increase will have no significant adverse effect on * * * the quality of the human environment within the meaning of the Environmental Policy Act of 1969." The Commission therefore allowed the surcharge to go into effect without suspension, "subject to the conditions that the carrier parties to this proceeding publish upon not less than two days' notice supplements, to become effective on February 5, 1972, (1) providing for an expiration date not later than June 5, 1972, (2) providing that the application of the surcharge or increases in rates and charges on freight in trailer bodies, semi-trailers, vehicles or containers on flat cars, on export and import traffic, proposed by the western and southern carriers be cancelled * * * and (3) providing that the proposed surcharge

and increased rates and charges do not apply to shipments originating prior to February 5, 1972 and moving under transit arrangements." At the same time, the Commission held in abeyance the investigation begun by its December 21 order until receipt from the carriers of request to file permanent tariffs with selective increases to replace the surcharge after its expiration.

This request came on February 28, 1972. The railroads offered to file selective increases averaging 4.1 per cent to go into effect on April 1. On March 6 the Commission issued an order permitting the railroads to republish their proposal, with the selective increases to go into effect no earlier than May 1, 1972. The railroads did so, and on April 24 the Commission issued the second order attacked by SCRAP in which it suspended the 4.1 per cent selective increases for the statutory seven-month period until November 30, 1972, while at the same time permitting an extension of the 2.5 per cent interim surcharge until the end of the suspension period.

In the meantime, SCRAP and others were engaged in negotiations with the Commission in an effort to secure compliance with NEPA in conjunction with these rate proceedings. Specifically, SCRAP objected to the Commission's failure to issue an impact statement on the effect of the 2.5 per cent surcharge on the shipment and use of recyclable materials. Partly in response to pressure from SCRAP,[5] the Commission on March 6 issued a 6-page document entitled "Draft Environmental Impact Statement—Ex Parte 281—Increased Freight

---

4. The Commission also ordered the railroads to submit "a statement regarding the environmental impact of the proposal." 340 ICC at 362. On Jan. 3, 1972, the railroads complied by submitting a statement which alleged that the proposal had no environmental impact. We need hardly point out that this self-serving statement by one of the parties cannot take the place of a NEPA impact statement which, according to the statute, must be prepared "by the responsible official." *See* Greene County Planning

Board v. F.P.C., 2 Cir., 455 F.2d 412, 420 (1972).

5. On Feb. 3, 1972 SCRAP and the ICC entered a "Memorandum of Understanding" whereby SCRAP agreed not to seek an injunction against the Commission's Feb. 1 order in exchange for the ICC's promise to "issue a draft environmental statement in accordance with the requirements of N.E.P.A. and * * · * otherwise comply· with the requirements of that Act, in Ex Parte 281."

Rates and Charges, 1972." The focus of this document is somewhat ambiguous. It could not have been intended to apply to the 2.5 per cent interim surcharge, since this had already gone into effect and, in any event, the Commission strongly contended that no impact statement was necessary in conjunction with the temporary rate increase. But neither does the document on its face appear to deal with the railroads' proposed 4.1 per cent selective increase to take effect on November 30, 1972. Rather, the statement seems to be based on the obviously erroneous hypothesis that the 2.5 percent surcharge would be made permanent after November 30.[6] The Commission has never adequately explained why it bothered to prepare a draft impact statement premised on facts it knew to be false, and the reason why the ICC finds itself with the resources necessary to prepare draft statements based on false hypotheses while it is assertedly without resources to prepare impact statements as required by NEPA based on real facts remains one of the enduring mysteries of this case.

Nonetheless, without stopping to assess its relevance, we merely note that the March 6 statement found that the "imposition of, or failure to impose, a surcharge of 2.5 percent as a permanent part of the railroad rates applicable on freight services might have some impact on the environment; however, based on the varying predictions of the parties in their statements filed to date, it is unclear what the effect would be." The statement proceeds to examine alternatives to an across-the-board increase in

extremely cursory fashion, and concludes that "[i]t is impossible at this point in the investigation to assess with any certainty the environmental impact of assessment of, or failure to assess, a surcharge on various recyclable materials. The parties are called upon to submit factual data with regard to this issue." SCRAP and the Environmental Defense Fund as well as the President's Council on Environmental Quality (CEQ) and the Environmental Protection Agency all roundly condemned the draft statement as insufficient. Nonetheless, the Commission has as yet filed no additional impact statements, although it has promised to file a final statement some time before the 4.1 per cent selective increase takes effect on November 30.

With the case in this posture, plaintiff brought this suit to enjoin enforcement of the Commission's February 1 and April 24 orders.[7] In addition, plaintiff sought to enjoin the Commission from allowing the permanent rate increase planned for November 30 to become effective before the Commission complied with NEPA. As noted above, we have decided to dismiss that portion of the complaint dealing with the February 1 order as moot and to grant relief with respect to the April 24 order only to the extent that the order permits rate increases on shipment of recyclable goods. Inasmuch as the Commission has as yet taken no final action with respect to the 4.1 per cent selective increase, we also conclude that the lawfulness of this tariff is not ripe for review. In light of the Commission's somewhat disappointing performance to date, however,[8] we

---

6. The draft statement says, "While the Commission has made it quite clear that the surcharge now in effect will expire by operation of law no later than June 5, 1972, and thus cannot actually become a permanent part of the railroads' rate structure, nevertheless, for the purpose of analyzing its impact upon environment, and for that purpose only, we shall treat it arguendo as though it were not an interim, but a permanent increase."

7. A 3-judge court was convened pursuant to 28 U.S.C. §§ 2325 & 2284 (1970). The Environmental Defense Fund, National

Parks and Conservation Association, and Izaak Walton League of America were allowed to intervene as plaintiffs, and a group of railroads was allowed to intervene as defendants.

8. Unfortunately, we must confess to considerable doubt as to whether the Commission will comply with NEPA as to the 4.1% increase if left to its own devices. As noted above, the Commission has already issued a draft statement in relation to these proceedings which both the President's CEQ and the Environmental Protection Agency found to be grossly

have decided to retain jurisdiction over this matter so as to insure that any permanent tariffs which are permitted to take effect are preceded by an impact statement in conformance with NEPA and the CEQ Guidelines.

## II. Standing

■ As a threshold matter, defendants vigorously contest plaintiff's standing to bring this action. They argue that plaintiff has no more than a general interest in seeing that the law is enforced and that plaintiff's members have failed to distinguish themselves from other citizens who are also concerned with the environment.

In its amended complaint, however, plaintiff alleges that its members use the forests, streams, mountains, and other resources in the Washington area for camping, hiking, fishing and sightseeing, and that this use is disturbed by the adverse environmental impact caused by nonuse of recyclable goods. It is clear that plaintiff organization has standing to raise the rights of its members, *see, e. g.*, NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), and we think plaintiff has alleged the kind of "injury in fact" to those members which would give them standing to sue. *See* Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L. Ed.2d 192 (1970).

Moreover, plaintiff's allegation that its members actually use the environmental resources adversely affected by the Commission action is sufficient to distinguish this case from Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), where the Sierra Club failed to allege "that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." 405 U.S. at 735, 92 S.Ct. at 1366.[9]

inadequate. Our independent reading of the draft statement leads to the conclusion that this assessment is a charitable one. Indeed, the draft statement is so deficient that it may not comport with the statutory requirement that the Commission permit comment from interested parties before making its impact statement final. *See* 42 U.S.C. § 4332 ("Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved"). *See also* Council on Environmental Quality—Statements on Proposed Federal Actions Affecting the Environment (hereinafter CEQ Guidelines), 36 Fed.Reg. 7724, 7726 (1971). Aside from its questionable relevance, *see* text at pp. 193–194, *supra*, the draft statement fails to discuss in any detail the possible environmental effects of the higher freight rates, fails to discuss the alternatives to an across-the-board increase, and impermissibly relies on the parties instead of the Commission's own investigative apparatus to uncover possible environmental effects of the action. It should go without saying that the mere filing of a document labelled "final impact statement" is insufficient to shield an agency from judicial review if the document fails to comply with the standards outlined in NEPA. *See, e. g.*, Environmental Defense Fund v. Corps of Engineers, D.D.C., 331 F.Supp. 925 (1971).

The Commission assured us at oral argument that it had been following NEPA and issuing impact statements as a matter of course. However, in a subsequent communication to the court, the Commission conceded that in the 2 years since the effective date of NEPA it has issued only one impact statement, and that under judicial compulsion. *See* City of New York v. United States, E.D.N.Y., 337 F.Supp. 150 (1972).

9. In *Sierra Club amicus curiae* brought to the Court's attention the fact that members of the petitioner organization "conducted regular camping trips into the Mineral King area, and * * * used and continue to use the area for recreational purposes." However, the Court refused to consider these allegations since they "were not contained in the pleadings, nor were they brought to the attention of the Court of Appeals." But the Court pointedly noted that its "decision does not, of course, bar the Sierra Club from seeking in the District Court to amend its complaint * * *." 405 U.S. at 735 n. 8, 92 S.Ct. at 1366 n. 8. In

The mere fact that plaintiff's allegation do not distinguish its members from a great many others who use our natural resources does not disqualify it as a party. *Sierra Club* also makes plain that "[a]esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." *Ibid.*

### III. Jurisdiction

The jurisdictional issues raised by defendants are more complex and not so easily disposed of. Nonetheless, when the question is parsed out, we conclude that we do have jurisdiction to provide the relief requested.

### A.

The Commission places primary reliance on Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963), and a related line of cases holding that the courts lack jurisdiction to extend the statutory seven-month suspension period when the Commission declines to rule on the reasonableness of proposed tariffs within the statutory period. Although the actual holding in *Arrow* is quite narrow, the Court's dicta has more sweeping implications. "We cannot believe that Congress would have given such detailed consideration to the period of suspension unless it meant thereby to vest in the Commission the sole and exclusive power to suspend and to withdraw from the judiciary any pre-existing power to grant injunctive relief. This Court has previously indicated its view that the present section had that effect. In

Board of Railroad Comm'rs v. Great Northern R. Co., 281 U.S. 412, 429 [50 S.Ct. 391, 396, 74 L.Ed. 936], Chief Justice Hughes said for the Court: 'This power of suspension was entrusted to the Commission only.' The lower federal courts have also said as much. And the commentators on the matter have consistently supported the soundness of that view." 372 U.S. at 667–668, 83 S. Ct. at 988. *See also* ICC v. Inland Waterways Corp., 319 U.S. 671, 62 S.Ct. 1296, 87 L.Ed. 1655 (1943); National Industrial Traffic League v. United States, D.D.C., 287 F.Supp. 129 (1968) *affirmed*, 393 U.S. 535, 89 S.Ct. 873, 21 L.Ed.2d 754 (1969); Mover's and Warehousemen's Ass'n v. United States, D.D.C., 227 F.Supp. 249 (1964); Algoma Coal & Coke Co. v. United States, E.D. Va., 11 F.Supp. 487 (1935).

■ But although the *Arrow* doctrine grants the Commission broad discretion at the suspension stage, we are far from convinced that it is relevant to this case. The thrust of the doctrine seems to be that judicial review is available only when the rates in question are Commission-made rather than carrier-made.[10] *See* Algoma Coal & Coke Co. v. United States, *supra*, 11 F.Supp. at 494. So long as the rates are authored by the carriers, the Commission's mere failure to suspend them does not give rise to a cause of action. *Cf.* Port of New York Authority v. United States, 2 Cir., 451 F.2d 783 (1971).

We are not certain, however, that the rates in question here can be meaningfully described as carrier-made. This is not a case where the Commission merely stands silently by and allows carrier-made rates to take effect without suspension. Rather, the Commission issued an *order* in which it explicitly

---

this case plaintiff has followed the Supreme Court's suggestion and amended its complaint to conform to *Sierra Club* requirements. Consequently, it is not surprising that it meets the *Sierra Club* test for standing.

10. This puts to one side, for the moment, the possibility of securing judicial review

of even carrier-made rates through an action by an individual shipper for reparations under 49 U.S.C. § 13 (1970). *See* Alabama Power Co. v. United States, D.D.C., 316 F.Supp. 337 (1969), *affirmed by equally divided Court, sub nom.* Atlantic City Elec. Co. v. United States, 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970).

found that "the increases here proposed are just and reasonable, that the revenues derived therefrom will result in earnings and rates of return for the railroads * * * not in excess of that required to enable them to render adequate and efficient transportation at the lowest cost consistent with the furnishing of such service."

■ True, the mere finding of "reasonableness" does not, by itself, convert these rates into a Commission-made tariff, particularly in light of the Commission's explicit statement that it was not prescribing rates within the meaning of Arizona Grocery Co. v. Atchison, Topeka & Santa Fe R. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). *See* ICC v. Inland Waterways Corp., *supra*, 319 U.S. at 686, 62 S.Ct. 1296; Algoma Coal & Coke Co. v. United States, *supra*, 11 F.Supp. at 492–494. But the Commission also attached a detailed set of conditions on approval of the rates without suspension, including the requirement of an expiration date and the cancellation of the surcharge as it affected certain types of freight. *See* text at pp. 192–193 *supra*. These conditions were authored by the carriers in only a Pickwickian sense, since the Commission made it abundantly clear that it would suspend the new rates if the conditions were not added. This circuit has held that an agency may not use its suspension power in effect to make rates and still avoid judicial review. *See* Moss v. CAB, 139 U.S.App.D.C. 150, 430 F.2d 891 (1970). *See also* ICC v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947). A suspension decision which effectively blackmails the carriers into submitting agency-authored rates is functionally indistinguishable from an agency order setting those rates and such orders are, of course, judicially reviewable. *See* 28 U.S.C. § 1336 (1970).

■■ It is unnecessary for us to decide whether the Commission has here injected itself sufficiently into the rate making process to bring this case within the *Moss* rule, however, since there is another, more compelling, argument for why this court possesses jurisdiction. In our view, NEPA implicitly confers authority on the federal courts to enjoin *any* federal action taken in violation of NEPA's procedural requirements, even if jurisdiction to review this action is otherwise lacking.[11] Thus no one would contend that this or any court possesses independent jurisdiction to assess the wisdom of a presidential decision to conduct a nuclear test. But when such a test was challenged because of a failure to comply with NEPA, the Court of Appeals for this circuit nonetheless assumed jurisdiction "to determine whether the agencies involved have fully and in good faith followed the procedure contemplated by Congress * * *." Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. ——, ——, 463 F.2d 783, 787 (decided October 5, 1971).

■ If NEPA mandates judicial review of so sensitive a matter as a nuclear test, then surely it mandates review of an agency suspension order as well. As Judge Friendly has observed, "NEPA is a new and unusual statute imposing substantive duties which overlie those imposed on an agency by the statute or statutes for which it has jurisdictional responsibility." City of New York v. United States, E.D.N.Y., 337 F.Supp. 150, 164 (1972). The power of courts to enforce these substantive duties is clear beyond question. "We conclude * * * that Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental val-

11. Thus on this view of NEPA there is jurisdiction to review even a mere failure to suspend rates which are wholly carrier-made so long as the review is confined to a determination as to whether the procedural requisites of NEPA have been followed.

ues. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse. As one District Court has said of Section 102 requirements: 'It is hard to imagine a clearer or stronger mandate to the Courts.'" Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Comm., 146 U.S.App.D.C. 33, 39, 449 F.2d 1109, 1115 (1971).

■ Nor do we believe that recognition of this independent jurisdiction under NEPA in any way undermines the policy of *Arrow*. *Arrow* is premised primarily on the Commission's broad discretion with regard to suspension and on its primary jurisdiction to determine in the first instance the reasonableness of proposed tariffs. But a judicial insistence on compliance with the non-discretionary procedural requirements of NEPA in no way interferes with the Commission's substantive discretion. In this case, as in Oscar Mayer & Co. v. United States, W.D.Wis., 268 F.Supp. 977, 982 (1967) (concurring opinion of Judge Doyle), there is "an attack on an alleged noncompliance of an administrative agency with an allegedly applicable statutory procedural requirement. The reasons for granting or refusing to grant or revoking a suspension order are wholly committed to Commission discretion and are invulnerable to judicial review. But the method or procedure by which the Commission takes action is *not wholly committed to its discretion* and is not invulnerable to judicial review." *See also* Naph-Sol Refining Co. v. United States, W.D.Mich., 269 F.Supp. 530, 532 (1967); Long Island Railroad Co. v. United States, E.D.N.Y., 193 F.Supp. 795, 799 (1961). This position is strengthened where, as here, the procedures are required by a separate statute conferring independent power on the courts to enforce its requirements.

### B.

The Commission places secondary reliance on cases like Alabama Power Co. v. United States, D.D.C., 316 F.Supp. 337 (1969), holding that the courts lack jurisdiction to review permissive general rate orders where the shipper has an adequate remedy to secure individual refunds under 49 U.S.C. § 13. However, it is not altogether clear that *Alabama Power* retains precedential value in this circuit in light of the fact that the case was decided by a divided three-judge District Court and then affirmed, without opinion, by an equally divided Supreme Court. *See* Atlantic City Electric Co. v. United States, 400 U.S. 73, 91 S. Ct. 259, 27 L.Ed.2d 212 (1970). Moreover, even if *Alabama Power* is considered good law, it does not seem to be relevant here. Our plaintiff, unlike the plaintiff in *Alabama Power,* is not a shipper. It is not concerned with the individual rates paid by individual shippers. The thrust of its complaint is that the overall rate structure has an adverse environmental impact. The appropriate time to review this claim is when the overall rate structure is set rather than on a piecemeal basis. *Cf.* Electronic Industries Ass'n v. United States, D.D.C., 310 F.Supp. 1286, 1289 (1970). Furthermore, even if the piecemeal review contemplated by *Alabama Power* were desirable, it is not available in this case. 49 U.S.C. § 13 is cast in terms of reparations to be made to shippers for overcharges. But plaintiff is not a shipper and it does not seek reparations. Hence its action must be brought now if it is to be brought at all.

### IV. The Merits

Although the Commission forcefully presses its standing and jurisdictional arguments, it does not rest upon these alone. It also contends that its actions are in full compliance with both the spirit and letter of NEPA. Specifically, the Commission argues that it has made an environmental assessment of the 2.5 per cent surcharge and that it is under no obligation to file an impact statement —at least until the November 30 4.1 per cent selective increases take effect.

■ We find ourselves unable to accept these contentions. 42 U.S.C. § 4332(2) (C) explicitly requires the prep-

aration of an impact statement in conjunction with "major Federal actions significantly affecting the quality of the human environment." It is conceded that no impact statement has been prepared to accompany the April 24 order extending the 2.5 per cent surcharge until November 30. Thus the Commission stands in violation of NEPA unless it can demonstrate either (a) that the April 24 order is not a "major Federal action" or (b) that the April 24 order does not "significantly [affect] the quality of the human environment." We conclude that the Commission has failed to prove the truth of either of these propositions.

### A.

The Commission seems to take the position that temporary rate increases are not major federal actions because they must be decided upon quickly and do not lend themselves to the sort of reflective deliberation which NEPA requires. *Cf.* Cohen v. Price Commission, S.D.N.Y., 337 F.Supp. 1236 (1972); Port of New York Authority v. United States, *supra.* It seems clear, however, that these considerations are not relevant to the importance of the action undertaken. The Commission's position appears to rest on the *non sequitur* that because an action is taken quickly it is therefore unimportant. Yet it hardly requires argument to demonstrate that some of the most important federal actions in our history have also been taken with great alacrity. To the extent that the need for speed is relevant at all, it goes not to the importance of the federal action, but to the provision in NEPA which requires compliance only "to the fullest extent possible." *See* 42 U.S.C. § 4332.[12] But if

the Commission wishes to argue from the "fullest extent possible" clause, it bears a much heavier burden of proof— a burden which it has not begun to meet. "We must stress as forcefully as possible that this language ['to the fullest extent possible'] does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow 'discretionary.' Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts." Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Comm., *supra*, 146 U.S.App.D.C. at 38, 449 F.2d at 1114.

Nor is the Commission's order disqualified as a "major Federal action" because it is only temporary in nature, to be replaced on November 30 by a permanent rate structure.[13] This circuit was presented with a similar argument in *Calvert Cliffs* wherein the Atomic Energy Commission argued that an impact statement was unnecessary at the pre-operating stage of nuclear generator construction since the environmental impact would be fully considered at the licensing stage. The argument was unambiguously rejected. "Compliance [with NEPA demands] that environmental issues be considered *at every important stage in the decision making process* concerning a particular action— at every stage where an overall balancing of environmental and nonenvironmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs." 146 U.S.App.D.C. at 42, 449 F.2d

---

12. We might look with sympathy, for example, on some modifications in the time requirements for draft impact statements and comments contained in the CEQ Guidelines so as to better accommodate them to the fast-moving suspension process. But we do not think that the necessity to modify some NEPA procedures justifies the wholesale abandonment of impact statements altogether.

13. This case is distinguishable from Cohen v. Price Commission, S.D.N.Y., 337 F. Supp. 1236 (1972), where a District Court held that Congress did not intend NEPA to apply to temporary *agencies* such as the Federal Price Commission. Whatever one thinks of the Interstate Commerce Commission, as the oldest federal regulatory agency it can hardly be called "temporary."

at 1118. (Emphasis added.) *See also* Greene County Planning Board v. FPC, 2 Cir., 455 F.2d 412 (1972); Environmental Defense Fund, Inc. v. Corps of Engineers, E.D.Ark., 325 F.Supp. 749, 756 (1971).

 Similarly, the CEQ has made plain that the necessity of preparing an impact statement cannot be avoided or postponed by denominating a decision "temporary" or by breaking it down into minute component parts. "In considering what constitutes major [Federal] action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable. This can occur when one or more agencies over a period of years puts into a project individually minor but collectively major resources, when one decision involving a limited amount of money is a precedent for action in much larger cases or represents a decision in principle about a future major course of action, or when several Government agencies individually make decisions about partial aspects of a major action." CEQ Guidelines at 7724.[14]

In light of these interpretations of the statutory language, we think it clear beyond doubt that this order is a "major Federal action." If we understand the Commission's decision correctly, it affects virtually every piece of freight moved by rail in this country between now and November 30.[15] In New York City v. United States, *supra,* a three-judge District Court held that an order permitting abandonment of a few miles of track by a single railroad was a major federal action. In Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 5 Cir., 446 F.2d 1013 (1971), the Court of Appeals held that the funding of a highway project through a single locality was major federal action. If these governmental decisions require an impact statement, then surely this decision—involving as it does almost every railroad in the country and hundreds of millions of dollars in freight charges—requires one as well.

### B.

The Commission refers us to a provision in its February 1 order wherein it states that "the involved general increase will have no significant adverse effect on * * * the quality of the human environment within the meaning of the Environmental Policy Act of 1969." On the basis of this single sentence the Commission asks us to believe that its order will not "significantly [affect] the quality of the human environment" within the meaning of NEPA and that hence an impact statement is not required.[16]

---

14. Although the CEQ Guidelines lack the force of law, we should "not lightly suggest that the Council, entrusted with the responsibility of developing and recommending national policies 'to foster and promote the improvement of the environmental quality,' * * * has misconstrued NEPA." Greene County Planning Board v. F.P.C., *supra* note 4, 455 F.2d at 421. Moreover, the ICC appears to have incorporated by reference the CEQ Guidelines into its own rules. *See* Implementation of National Environmental Policy Act, 340 ICC 431, 442 (1972).

15. This action is thus considerably more important than that involved in Port of New York Authority v. United States, 2 Cir., 451 F.2d 783 (1971), since that case involved an interim rate increase for only one carrier and, even as to that carrier, for only a very limited class of service.

16. Evidently this stratagem for avoiding the requirements of NEPA is employed by the Commission on a regular basis. In its supplemental communication to this court the Commission boasts, with apparently unintended irony, that "in every substantive order issued since the adoption of its environmental rules, there is either an express finding by the Commission that the decision does not constitute a major Federal action having a significant effect on the human environment within the meaning of NEPA, or an impact statement would be issued. Literally hundreds of Commission orders have now been issued containing the negative statement or finding."

It should be obvious that the NEPA requirements cannot be circumvented by so transparent a ruse. The main purpose of an impact statement is to force assessment of the environmental impact of a proposed action. Therefore, a statement is required whenever the action *arguably* will have an adverse environmental impact.[17] As the CEQ Guidelines state, " * * * actions may be localized in their impact, but if there is *potential* that the environment may be significantly affected, the statement is to be prepared. *Proposed actions, the environmental impact of which is likely to be highly controversial,* should be covered in all cases." 36 Fed.Reg. at 7724. (Emphasis added.)

Once the test is so understood, we think it clear that the danger of an adverse impact is sufficiently real to require a statement in this case. As the CEQ stated in its comments to the ICC on the draft statement, "Because recycling yields large environmental benefits, any policy which raises the price of wastes probably reduces the level of recycling from what it would have been without the price increase. This can have an adverse environmental effect. To suggest that there is no effect is simply not supported by general economic factors * * *." Indeed, the Commission itself now seems to concede that there is some danger of an environmental impact. In its draft impact statement it says "the imposition of, or failure to impose, a surcharge of 2.5 percent as a permanent part of the railroad rates applicable on freight services might have some impact on the environment." In light of this concession, we hold that, as the record presently appears, an environmental impact statement will be necessary in this case relating to the 2.5 per cent increase in rates.

## V. Balancing of Equities

Defendant's final contention is that plaintiff has failed to demonstrate that the traditional equitable balancing weighs in favor of preliminary relief. Defendant argues that the railroads will suffer irreparable damage if the preliminary injunction is granted, that the plaintiff will not be injured if relief is delayed, and that the public interest would be harmed by enjoining the temporary surcharge.

It is, of course, true that plaintiff must meet the requirements outlined in Virginia Petroleum Jobbers Ass'n v. F. P.C., 105 U.S.App.D.C. 172, 265 F.2d 364 (1959), before preliminary relief will be afforded. But in light of the strong likelihood that plaintiff will prevail on the merits, it would require a powerful showing by the defendants that the other aspects of the test point in their favor before relief could be denied.

We conclude that no such showing has been made. While the public has an undoubted interest in the efficient operation of the railroads, the strongest sort of public interest weighs in favor of the preservation of the environment. This interest has been considered sufficient to support preliminary relief in countless cases even when there have been vital public concerns on the other side of the scale.

Nor is the balancing of relative harm nearly so one-sided as the railroads would have us believe. On the one hand, the damage done to the environment is likely to be irreparable. Surely it cannot be undone, as the railroads contend, by subsequent rebates to shippers, since once raw materials are unnecessarily extracted from the ground and used, they cannot be returned from whence they came. On the other hand, the damage

---

17. We might look upon this case differently if the record revealed a detailed study by the Commission at the conclusion of which it found no significant environmental impact and, hence, no need for an impact statement. *Cf.* Citizens for Reid State Park v. Laird, D.Maine, 336 F.Supp. 783 (1972). But here the Commission's "finding" of no environmental impact appears to be no more than glorified boilerplate. *See* note 16 *supra.* Clearly NEPA would be rendered meaningless if an agency could avoid its mandate by baldly asserting that it "finds" no need to comply with it.

done the railroads by granting the injunction, while clearly nonfrivolous, is not overwhelming. The surcharge will remain in effect only until November 30 in any event, so the revenue losses will be over a short period. Moreover, the railroads have been collecting the surcharge in the first place subject to the possibility that the money might have to be refunded if the Commission subsequently found the new rates unreasonable. And finally, the railroads' losses will be diminished significantly by allowing them to collect the surcharge on all nonrecyclable goods.

Accordingly, the preliminary relief requested by plaintiff is granted to the extent outlined above.

So ordered.

District Judge FLANNERY concurs in the result.