**MOBIL OIL CORPORATION et al., Plaintiffs,**

v.

**FEDERAL TRADE COMMISSION et al., Defendants.**

**No. 75 Civ. 2748 (JMC).**

United States District Court, S. D. New York.

March 1, 1977.

Donovan, Leisure, Newton & Irvine, New York City (Andrew J. Kilcarr, Washington, D. C., and Thomas R. Trowbridge, III, New York City, of counsel), and Charles F. Rice, New York City, for plaintiff Mobil Oil Corp.

Jesse P. Luton, Jr., and John E. Bailey, Houston, Tex., for plaintiff Gulf Oil Corp.

Howrey, Simon, Baker & Murchison, Washington, D. C. (J. Wallace Adair and Keith E. Pugh, Jr., Washington, D. C., of counsel), and George S. Wolbert, S. R. Vandivort, and A. M. Minotti, Houston, Tex., for plaintiff Shell Oil Co.

Pillsbury, Madison & Sutro, San Francisco, Cal. (Turner H. McBaine, Wallace L. Kaapcke and Richard W. Odgers, San Francisco, Cal., of counsel), for plaintiff Standard Oil Co. of California.

Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, New York City (Nathaniel L. Gerber, Asst. U. S. Atty., New York City, of counsel), for defendants.

## OPINION

CANNELLA, District Judge:

Plaintiffs' motion for summary judgment is granted. Defendants' motions to dismiss the complaint and, alternatively, for summary judgment are denied.

On July 18, 1973, the Federal Trade Commission ("FTC" or "Commission") issued a complaint, *In the Matter of Exxon Corp., et al.*, Docket No. 8934 (hereinafter this administrative proceeding will be referred to as *Exxon* ), charging the plaintiffs herein and four other major oil companies with violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The respondents in *Exxon* are charged with combining to monopolize the refining of crude oil into petroleum products, maintaining monopoly power over the refining process, and restraining trade and maintaining a noncompetitive market structure in this industry. The Commission also is challenging certain alleged practices including joint ventures in transport and in onshore and offshore lease bidding. By way of relief, Commission counsel stated that they were seeking substantial divestiture of the pipelines and refinery capacity owned by the *Exxon* respondents.[1] Specifically, the proposed relief includes:

(1) The divestiture of 40 to 60 percent of respondents' refinery capacity in the relevant market and the establishment of 10 to 13 new firms;

(2) The divestiture of all crude and produce pipelines which connect directly to the new firms and are owned and operated by the refining department of the parent; and

(3) The transfer to the new firms of fractional ownership shares in connecting joint venture pipelines.[2]

Soon after the commencement of the action, the *Exxon* respondents moved to require complaint counsel to file an environmental impact statement ("EIS") exploring the environmental consequences of the proposed relief. In support of their joint motion, the *Exxon* respondents argued that the requested relief would constitute "major Federal action significantly affecting the quality of the human environment" within the meaning of Section 102(2)(C) of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(C).[3]

---

1. Prediscovery Statement of February 22, 1974.

2. Complaint, *Mobil Oil Corp. v. FTC*, 75 Civ. 2748, at 4.

3. The statute reads in pertinent part:

The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall—
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environ-

On February 5, 1975, the administrative law judge denied the motion to require an EIS as well as a motion for immediate certification to the Commission. In so acting, he placed primary reliance upon an FTC rule[4] exempting law enforcement proceedings instituted by the Commission from the requirements of § 102(2)(C). On February 25, 1975, the *Exxon* respondents' request to file an interlocutory appeal from the denial of their motion was denied by the administrative law judge. They then petitioned for extraordinary review by the Commission, which was denied on April 29, 1975.

On June 6, 1975, four of the eight *Exxon* respondents brought the instant action seeking to enforce FTC compliance with the requirements of § 102(2)(C) of NEPA. Plaintiffs have moved for summary judgment on their claims that complaint counsel are required by § 102(2)(C) of NEPA to file an EIS and that § 1.82(d) of the FTC's Rules of Practice is void as being in conflict with NEPA. In response to this motion the defendants have cross-moved for dismissal pursuant to Rule 12(b) of the Federal Rules of Civil Procedure on the grounds that the plaintiffs lack standing, that their suit is premature and that their complaint fails to state a claim upon which relief can be granted and, alternatively, for summary judgment. Based upon the Court's finding that the Commission's institution of the *Exxon* proceeding constitutes a "major Federal [action] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), the Court concludes that plaintiffs herein are entitled to summary judgment.

STANDING

The threshold issue in this case is whether plaintiffs have standing to challenge the FTC's institution of an enforcement proceeding against them without first having filed an environmental impact statement.

Whether a litigant has standing to seek judicial determination of his claims has been litigated on numerous occasions before the United States Supreme Court. In a recent opinion, the Court stated:

This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. *E. g., Barrows v. Jackson,* 346 U.S. 249, 255–256, 73 S.Ct. 1031, 1034–1035, 97 L.Ed. 1586 (1953). . . .

In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

*Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

When the litigant claims that he is "[a] person suffering legal wrong because of agency action, or adversely affected or

---

mental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes . . . .

**4.** This administrative ruling provides that

Nothing in this procedure shall be construed as stating or implying that the require-

ments of section 102(2)(C) of the National Environmental Policy Act apply to: Any investigation made by the Commission for law enforcement purposes; any process or order issued by the Commission in connection with any type of investigation; any agreement of voluntary compliance or consent decree entered into by the Commission; or any adjudicatory proceedings commenced by the Commission.

16 C.F.R. § 1.82(d).

aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, the standing test has been articulated as whether the complainant has suffered "injury in fact" to an interest "arguably within the zone of interests to be protected or regulated" by that statute.[5] *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970);[6] *accord, Evans v. Hills,* 537 F.2d 589, 590–92 (2d Cir. 1976) (en banc). *But see* K. Davis, *Administrative Law of the Seventies* § 22.02–11 (1976). Although the injury in fact in *Data Processing* was economic, the Court recognized that this "interest, at times, may reflect 'aesthetic, conservational, and recreational' as well as economic values." 397 U.S. at 154, 90 S.Ct. at 830; *accord, United States v. SCRAP,* 412 U.S. 669, 686–87, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 733–34, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

▪▪▪ The interests sought to be protected by NEPA may be gleaned from the statute's declaration of purpose:

To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation . . . .

42 U.S.C. § 4321. Accordingly, plaintiffs have standing to bring this action only if they have alleged—and can prove—*environmental* injury in fact.

Such injury was alleged in *United States v. SCRAP, supra,* wherein environmental organizations sought to enjoin the enforcement of an Interstate Commerce Commission order that would allow railroads to collect a surcharge. They argued, as do the plaintiffs herein, that the agency's failure to file an EIS rendered its action unlawful. The allegations of the environmental organizations that their members used the natural resources in the Washington metropolitan area for recreation and "that this use was disturbed by the adverse environmental impact caused by the nonuse of recyclable goods brought about by a rate increase on those commodities," 412 U.S. at 685, 93 S.Ct. at 2415, were found sufficient to confer standing on the groups to challenge the rate increase.[7]

5. Even where the litigant has alleged injury in fact to an interest arguably within the zone of interests to be protected or regulated by a particular statute, the party may be barred from seeking judicial review of agency action "if Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion." *Barlow v. Collins,* 397 U.S. 159, 165, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970); 5 U.S.C. § 701(a).

The clear mandate of NEPA—that all federal agencies *shall* prepare an environmental impact statement prior to taking a major federal action that may "significantly [affect] the quality of the human environment," 42 U.S.C. § 4332(2)(C)—belies any suggestion that judicial review is precluded in this case.

6. The "injury in fact"/"zone of interests" test was used by Justice Douglas to clarify the general concept of standing. Indeed, the very language used in § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, was viewed as no more than an application of the law of standing to the situation where the injury alleged has been caused by action taken by an administrative agency—not as creating new standing criteria for use in a particular context. *See generally Flast v. Cohen,* 392 U.S. 83, 101–02, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Notwithstanding the Court's analysis in *Data Processing,* subsequent Supreme Court decisions have characterized the "injury in fact"/"zone of interests" test as peculiarly applicable in cases brought pursuant to § 10 of the APA— probably because *Data Processing* involved the operation of that provision. *See Sierra Club v. Morton,* 405 U.S. 727, 732–33, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The question whether use of this standing test would be appropriate in a non-administrative context, however, need not be decided today because plaintiffs' allegations fit precisely within § 10 of the APA.

7. That the challenged agency action had nationwide applicability and thus, it was alleged, would affect adversely the natural resources all across the country was not seen as an impediment to the environmentalists' standing. The Court observed that "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government

In the instant action, plaintiffs allege that the relief requested by the FTC in the enforcement proceeding would result in unnecessary depletion of our nation's natural resources. As oil companies, dependent upon these resources, plaintiffs would thereby suffer injury in fact. The injury alleged is thus both economic (without the necessary supply of resources, the companies might suffer reduced revenues) and environmental (by virtue of their status as oil companies, plaintiffs have a stake in our nation's environment).

Additionally, plaintiffs allege that the proposed divestiture of a substantial percentage of their refineries and pipelines would have a polluting effect on the environment. It is claimed, for example, that various aspects of a refinery's operations, including—"the sulfur content of the crude oil refined, the percentage of capacity at which it is operated and the means of transportation used for crude oil and refined product"—directly affect the environment.[8] A relationship thus established between the environment and a particular refinery, it would follow that any change in operations inevitably would have an environmental impact.

The FTC also is challenging the number of processing arrangements and exchange agreements among the major oil companies. It is alleged by the plaintiffs that restrictions on these arrangements, which are designed to reduce transportation, would lead to increased fuel consumption and pollution.

The FTC is further objecting to the oil companies' practices concerning joint ventures in lease bidding. The plaintiffs contend that any alteration in these practices, especially with respect to offshore drilling, would affect the environment. In support of this argument, they cite the 1974 Draft Environmental Impact Statement prepared by the Bureau of Land Management of the United States Department of Interior re: Proposed Increase in Acreage to be Offered for Oil and Gas Leasing on the Outer Continental Shelf. According to this report, the production of oil, which entails "accidental loss of debris, discharge of drill cuttings, sand, drilling fluids, the burial of pipelines, and the accidental spillage of oil or other toxic materials," id., vol. 2, at 162, involves environmental consequences to the land, water and living organisms as well as affecting the aesthetic environment.

The above allegations, if proved, would be sufficient to confer standing on the plaintiffs. Because the Commission also has accused the plaintiff companies of diverting investment funds from domestic to foreign crude exploration and production, however, they will not be put to this proof. The Court is persuaded by plaintiffs' argument that an increase in domestic exploration and production "would, by its very terms, change the scope and speed with which domestic reserves are developed and depleted, thereby affecting vital supplies of natural resources,"[9] and agrees that "[t]his intention to alter the way in which society's

actions could be questioned by nobody." 412 U.S. at 688, 93 S.Ct. at 2416.

Similarly, the fact that the "line of causation" to the alleged injury was attenuated did not prove fatal to plaintiff's standing:

Of course, pleadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action. . . . But we deal here simply with the pleadings in which the appellees alleged a specific and perceptible harm that distinguished them from other citizens who had not used the natural resources that were claimed to be affected. If, as the railroads

now assert, these allegations were in fact untrue, then the appellants should have moved for summary judgment on the standing issue and demonstrated to the District Court that the allegations were sham and raised no genuine issue of fact.

Id. at 688–89, 93 S.Ct. at 2416 (footnotes omitted). See City of Hartford v. Town of Glastonbury, No. 76–6049 (2d Cir. Dec. 23, 1976), slip op. at 1093. See generally Duke City Lumber Co. v. Butz, 382 F.Supp. 362, 369 n. 15 (D. D.C.1974), aff'd per curiam, 176 U.S.App.D.C. 218, 539 F.2d 220 (1976).

8. Memorandum in Support of Plaintiffs' Motion for Summary Judgment, at 15.

9. Kilcarr Affidavit dated 7/31/75, at 3.

resources are used in and of itself supplies sufficient need for an impact statement.[10]

Support for this conclusion may be found in *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971). That case involved a challenge to the Secretary of the Interior's decision to terminate contracts for the purchase of helium from the plaintiff companies. The plaintiffs claimed that the Secretary could not terminate these contracts without complying with the impact statement process. Anticipating an objection to their standing to raise NEPA claims, the plaintiffs "alleged that if the helium is not extracted by them from the natural gas before the natural gas is delivered to the consumer, the helium would be vented into the atmosphere and lost when the natural gas was consumed as fuel." *Id.* at 653. The court found that the companies were motivated not only by their pecuniary interest in the continuation of the contracts, but also shared the public interest in avoiding needless "rapid depletion of the helium resources of the country." *Id.* at 656. Based upon these findings, the Tenth Circuit affirmed the judgment below enjoining the contracts' termination pending the Secretary's compliance with NEPA.

The depletion of our nation's resources is an injury to the very interest to be protected by NEPA. Like the plaintiffs in *National Helium*, the instant plaintiffs have shown that they would be among the injured, *compare Sierra Club, supra*, 405 U.S. at 735–40, 92 S.Ct. 1361, and the Court therefore finds that they have standing to bring this action.

The Government's reliance on two cases in which plaintiffs lacked standing to advance their claims, is misplaced. In *Zlotnick v. Redevelopment Land Agency*, 2 ELR 20235 (D.D.C.1972), *aff'd without opinion*, 161 U.S.App.D.C. 238, 494 F.2d 1157 (1974), wherein plaintiffs opposed an urban renewal plan, the court found that their interest in enjoining condemnation of their land was financial only. The plaintiffs did not live in the affected area and the land they owned consisted merely of a downtown lot. Noting plaintiffs' continuing efforts towards a financial settlement, the court opined that "they would abandon their environmental concerns in a moment if the price were right." *Id.* at 20236.

In *Clinton Community Hosp. Corp. v. Southern Md. Medical Center*, 374 F.Supp. 450 (D.Md.1974), *aff'd per curiam*, 510 F.2d 1037 (4th Cir.), *cert. denied*, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975), plaintiff hospital sought to enjoin the construction of a new facility approximately two miles away, claiming that, since aircraft passing over the proposed site would endanger the new facility's patients, an EIS should have been filed before the Department of Health, Education and Welfare ("HEW") issued a grant of feasibility for the proposed project. The amended complaint emphasized plaintiff's pecuniary interest in securing an injunction: plaintiff's 33-bed hospital would be unable to compete with a new 200-bed hospital nearby. Citing *Zlotnick*, the court held that this economic injury was not within the zone of interest protected by NEPA. Plaintiff's allegation that the environment in which the proposed hospital was to be situated would adversely affect the new facility's patients also did not render plaintiff a proper party to bring the suit. Firstly, the allegation did not constitute an injury suffered by the *plaintiff*. Furthermore, the injury suffered by hospital patients due to the hospital's environment may very well be within the zone of interests sought to be protected by an HEW statute regulating noise levels in patient care facilities, but is not even arguably within the zone of interests to be protected by NEPA.

A case procedurally similar to the instant case is *Gifford-Hill & Co., Inc. v. FTC*, 389 F.Supp. 167 (D.D.C.1974), *aff'd*, 173 U.S. App.D.C. 135, 523 F.2d 730 (D.C.Cir.1975). There, the FTC had instituted an adjudicatory proceeding against Gifford-Hill to determine whether the company was in violation of the antitrust laws. Alleging that the proceedings might lead to a divestiture order with resultant environmental impact,

---

**10.** Memorandum in Support of Plaintiffs' Motion for Summary Judgment, at 17.

plaintiff filed an action in the district court to have the administrative complaint nullified for failure of the Commission to file an EIS. In deciding that plaintiff lacked standing, the court of appeals found that Gifford-Hill's injury in fact—the cost of making its defense in the administrative proceeding and the risk of an adverse ruling—was not even arguably within the zone of interests to be protected by NEPA.[11] Thus, beyond the point of procedural similarity, *Gifford-Hill* is clearly distinguishable from the case presently before the Court.

Like the plaintiffs in *Zlotnick, Clinton Community Hospital* and *Gifford-Hill,* the instant plaintiffs will suffer financially if the FTC's enforcement action is successful. But financial injury in fact, although an insufficient predicate for actions brought pursuant to NEPA, does not automatically preclude a plaintiff from instituting such suits. As was noted with respect to plaintiffs in *National Helium Corp. v. Morton,* 455 F.2d 650, 654 (10th Cir. 1971), it may be " 'passing strange' to see the giants of the oil and gas industry representing the public interest, but  .  .  .  they [are] not per se disqualified to occupy this role  .  .  .  ."

■ The plaintiff oil companies are profit-seeking corporations. Their financial concerns, however, do not at all hinder their standing to raise NEPA issues because they "have alleged an injury in fact, namely, damage to the environment in which they work and upon which they depend for their livelihood and continued maintenance of the quality of their lives. This interest is arguably within the zone of interest sought to be protected by this intentionally broad protective statute." *Duke City Lumber Co. v. Butz,* 382 F.Supp. 362, 374 n.35 (D.D.C. 1974).

## REVIEWABILITY

■ A litigant may have standing to object to certain agency action, yet may be unable to have his claims decided at a particular time because the action or allegedly critical effect thereof is too remote or uncertain. In this regard, the FTC claims that the oil companies are not now entitled to judicial review because (1) they have not exhausted their administrative remedies; (2) there has not been any "final agency action" within the meaning of 5 U.S.C. § 704; and (3) the controversy is not yet ripe.

### Exhaustion

The FTC argues that the plaintiffs have not exhausted their administrative remedies because they brought this action before the Commission's enforcement proceeding culminated in a final order.[12] Plaintiffs counter that they satisfied the exhaustion requirement when their attempts to appeal the denial of their motion to require the Commission's filing of an EIS were unsuccessful.

■ It has been observed that [t]he doctrine [of exhaustion] is grounded upon several considerations: (1) the complaining party may ultimately prevail in the administrative proceeding; (2) fact questions may be presented which require factual determinations more properly addressed to the expertise of an agency than to a federal district court; and (3) resolution of these fact questions by the agency may effectively reduce or eliminate entirely the need for judicial review. *Atlantic Richfield Co. v. FTC,* 398 F.Supp. 1, 11 (S.D.Tex.1975); *accord, McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Consequently, it is necessary to examine the circumstances surrounding the particular agency ruling to determine whether further administrative proceedings might ultimately yield a result in movant's favor or illuminate the issue for subsequent judicial review.

---

11. The court dismissed plaintiff's argument, that divestiture of a company that provided it with sand and gravel would force plaintiff to open additional strip mines, as not constituting an allegation of injury in fact.

12. A final cease and desist order may be appealed to a circuit court of appeals. 15 U.S.C. § 45(c).

■ The FTC denied respondents' motion to require complaint counsel to file an EIS specifically because the Commission's own regulations exempt adjudicatory proceedings from the requirements of § 102(2)(C) of NEPA.[13] Leave to appeal was denied because the administrative law judge found that § 1.82(d) "clearly controls the instant matter and there is no basis for finding that there is a substantial ground for difference of opinion as to the application of the rule."[14] Similarly, the Commission denied respondents' petition for extraordinary review, finding nothing to warrant departure from regular procedures.

In that the administrative law judge based his legal conclusion that *Exxon* was not subject to § 102(2)(C) of NEPA on § 1.82(d) of the FTC regulations, it is extremely unlikely that the Commission ultimately will decide that an EIS is a pre-requisite of a final order. Nor was the judge's ruling related to factual considerations wherein a fuller administrative record might aid judicial review.

Thus, with respect to the issue now before the Court, plaintiffs have exhausted all avenues of administrative review. The fact that the adjudicative proceeding has not yet come to a close does not prevent this Court from concluding that plaintiffs have exhausted their administrative remedies. *See generally PepsiCo, Inc. v. FTC*, 472 F.2d 179, 186 n.7 (2d Cir. 1972) (Friendly, C.J.), *cert. denied*, 414 U.S. 876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973).

*Final Agency Action/Ripeness*

The Court has jurisdiction to review the FTC's failure to file an EIS adjunct to its enforcement proceeding against the plaintiffs only if the institution of that proceeding may be considered "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. It is therefore necessary to define what is meant by "final agency action" and to see if the

action taken by the FTC comes within that definition. The legislative history of the statute is not very helpful, see *PepsiCo, Inc., supra* at 186, but the cases undertake a functional analysis of this chameleon-like concept.

This point was explained in *Gage v. Commonwealth Edison Co.*, 356 F.Supp. 80 (N.D. Ill.1972). Plaintiffs therein sought to enjoin Edison's acquisition of land for a nuclear power plant pending the Atomic Energy Commission's filing of an EIS. The Commission moved to dismiss for lack of jurisdiction. Since jurisdiction had been asserted pursuant to 5 U.S.C. § 704, the district court had to decide whether the Commission's failure to file an EIS constituted "final agency action." The court opined that

> The AEC's alleged failure to act can constitute "final agency action" only if it can be established that the AEC has a clear legal duty under NEPA so to act. Absent such a duty, the AEC's inaction cannot be construed as final, for "final" necessarily implies that nothing is forthcoming in a certain course of action. . . . [T]he AEC's alleged present failure to prepare an environmental analysis prior to Edison's land acquisition cannot be considered final unless (1) the AEC has a clear statutory duty to prepare it prior to that time and (2) the land acquisition has occurred without the AEC's preparation of the analysis.

356 F.Supp. at 84.

In accord with this reasoning, assuming, *arguendo*, that FTC rule 1.82(d) does not immunize Commission enforcement proceedings from the mandate of § 102(2)(C) of NEPA, the mere institution of the *Exxon* action may be viewed as "final action" only if the FTC was required to have filed an EIS prior to commencement of the proceeding. In this regard, the Commission argues that environmental considerations are irrelevant unless and until a violation is found and that, if a violation is found and a

---

**13.** See note 4 *supra*.

**14.** *Exxon*, Order denying respondents' request for order granting leave to appeal order denying motion of respondents to require complaint counsel to file environmental impact statement (FTC Feb. 25, 1975).

remedy formulated, plaintiffs will have ample opportunity to press their NEPA claims. The purpose of the Commission action, however, is not to secure a declaratory judgment that respondents' activities violate the FTCA but to end such violations and prevent their recurrence. Admittedly, the procurement of a remedy hinges on the Commission finding that the oil companies are in fact violating the antitrust laws, but so does the success of any agency proposal depend upon many nonenvironmental factors.

█ The fact that a particular proposal might be abandoned somewhere along the reviewing road has never justified postponing environmental considerations until a final decision has been reached. *See, e.g., Greene County Planning Bd. v. FPC*, 455 F.2d 412, 418–22 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).[15] NEPA requires more than an after-the-fact acknowledgment of the environmental consequences that will flow from agency action; it requires that those consequences be examined in considering whether to undertake such action. *Harlem Valley Transp. Ass'n v. Stafford*, 500 F.2d 328, 335–36 (2d Cir. 1974); *Jones v. D.C. Redevelopment Land Agency*, 162 U.S.App.D.C. 366, 499 F.2d 502, 511 (1974), *Greene County Planning Bd. v. FPC*, 455 F.2d 412, 418–22 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1127–29 (1971) (Wright, J.).[16]

In *Calvert Cliffs', supra*, the petitioners challenged rules of the Atomic Energy Commission ("AEC") concerning certain nuclear facilities for which construction permits had been granted prior to the effective date of NEPA. The court of appeals ordered the AEC to revise its rules so that a full consideration of environmental issues would not await the operating license proceedings, a time when construction of the facilities already would have been completed. Judge Wright, speaking for the court, feared that at this stage

> there is likely to be an "irreversible and irretrievable commitment of resources," which will inevitably restrict the Commission's options. Either the licensee will have to undergo a major expense in making alterations in a completed facility or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass.

449 F.2d at 1128.

█ This analysis compels the conclusion that if the FTC is required to file an EIS, it must do so before it decides to proceed on a course of action which has as its goal an object that will significantly affect the environment.

█ The cases of *PepsiCo, Inc. v. FTC*, 472 F.2d 179 (2d Cir. 1972), *cert. denied*, 414 U.S. 876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973), and *Bristol-Myers Co. v. FTC*, 469 F.2d 1116 (2d Cir. 1972), do not weaken the Court's conclusion that plaintiffs herein meet the requirements of 5 U.S.C. § 704. *PepsiCo* involved the denial of a motion to

---

**15.** A degree of doubt has been cast on the continuing vitality of the Second Circuit's holdings in *Greene County*, as well as in *Calvert Cliffs' Coordinating Comm. v. AEC*, 146 U.S. App.D.C. 33, 449 F.2d 1109 (1971), and *Harlem Valley Transp. Ass'n v. Stafford*, 500 F.2d 328 (2d Cir. 1974), by the Supreme Court's holding in *Aberdeen & Rockfish R.R. v. SCRAP*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975). In that case, the Supreme Court interpreted the provision in NEPA, that the EIS "shall accompany the proposal through the existing agency review processes," 42 U.S.C. § 4332(2)(C), as not affecting the timing of the statement but only "what must be done with [it] once it is prepared . . . ." *Id.* at 320, 95 S.Ct. at 2356. The Court then noted that "[t]o the

extent to which [the above cases] read the requirement . . . differently, they would appear to conflict with the statute." *Id.* at 321 n.20, 95 S.Ct. at 2356. However, the Supreme Court did not otherwise question the circuit courts' reasoning in these cases.

**16.** Although "impact statements ought not to be modeled upon the works of Jules Verne or H. G. Wells[,] . . . they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process." *Scientists' Inst. For Pub. Info., Inc. v. Atomic Energy Comm'n*, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1093–94 (1973).

dismiss for nonjoinder of 513 Pepsi bottlers, after the FTC had granted the motion of the two bottlers that desired to intervene. The court affirmed the decision below, 343 F.Supp. 396 (S.D.N.Y.1972) (Cannella, J.), concluding that plaintiffs did not prove that without joinder of all the bottlers the administrative proceedings would result in a void order. Indeed, the Second Circuit found that the "decision whether to accede to PepsiCo's request for joinder was within the Commission's discretion." *Id.* at 190.[17] This situation is clearly distinguishable from the case before the Court. If § 102(2)(C) applies to FTC enforcement proceedings, the Commission is under a *mandatory obligation* to file an EIS at the commencement of the action. Failure to comply with this absolute requirement would operate to invalidate any order issuing from the administrative proceeding.

The FTC investigation in *Bristol-Myers, supra,* had not proceeded even to the point where a formal complaint was issued when Bristol-Myers sought to compel the Commission to issue subpoenas to aid the company's evidence-gathering. When the request was denied Bristol-Myers brought an action in district court. The Second Circuit affirmed the district court's refusal to intervene at this stage of the investigation, finding that Bristol-Myers would be afforded ample opportunity to present its claim to a court of appeals when and if a final cease and desist order issued. The court recognized that some circumstances may "justify interlocutory resort to corrective judicial process," 469 F.2d at 1118, but concluded that this was not such a case. By contrast, this Court finds that the instant alleged violation of § 102(2)(C) of NEPA—a major implementing vehicle for significant substantive legislation—compels immediate judicial intervention.

■■■■ If the FTC is required to comply with § 102(2)(C) of NEPA, it violated a mandatory statutory obligation when it failed to prepare an EIS prior to the commencement of the administrative proceeding. Ergo, the institution of *Exxon* constitutes "final agency action" for the purpose of giving this Court jurisdiction to decide the remaining claims.

Based upon the foregoing analysis, the Court also finds plaintiffs' claims to be ripe.[18]

---

17. The Second Circuit, per Judge Friendly, extrapolate[d] from cases such as *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), and *McCulloch v. Sociedad Nacional de Marineros,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), a principle that one can find "final agency action for which there is no other adequate remedy in a court" if an agency refuses to dismiss a proceeding that is plainly beyond its jurisdiction as a matter of law or is being conducted in a manner that cannot result in a valid order. The injury against which a court would protect is not merely the expense to the plaintiff of defending in the administrative proceeding, which *Myers [v. Bethlehem Corp.]* held not to be enough, 303 U.S. [41,] 51–52, 58 S.Ct. 459, 82 L.Ed. 638 [(1938)], but, in a case like this, the enormous waste of governmental resources and the continuing threat of a complete restructuring of an industry.
472 F.2d at 187 (footnote omitted).

18. Justice Harlan articulated the basic rationale of the ripeness doctrine:
   to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.
*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).
Because a functional analysis was undertaken by the Court in deciding that the Commission's commencement of *Exxon* sans EIS was "final agency action" within the contemplation of 5 U.S.C. § 704, the conclusion is compelled that this controversy is ripe. The applicability of § 102(2)(C) of NEPA to the *Exxon* enforcement action is an issue fit for judicial decision: if the FTC must file an EIS, it already should have done so. More significantly, postponement of judicial intervention pending a final cease and desist order might yield profound and irrevocable environmental consequences for the parties as well as generations of Americans. Where, as here, the need for relief is immediate and definite, *compare Daley v. Mathews,* 536 F.2d 519, 521–22 (2d Cir. 1976), judicial review of agency action is warranted.

## THE MERITS

▆ Having determined that plaintiffs are proper parties to bring this suit and that the issues are fit for judicial scrutiny at this time, the Court must grapple with the central issue of the instant controversy: Does § 102(2)(C) of NEPA apply to an FTC enforcement proceeding? The Court holds that it does, thereby invalidating § 1.82(d) of the FTC Rules of Practice as inconsistent with a federal statute. *See, e. g., Campbell v. Galeno Chem. Co.,* 281 U.S. 599, 610, 50 S.Ct. 412, 74 L.Ed. 1063 (1930) (Brandeis, J.).

*The Statute: What It Says; What It Means*

The inquiry begins with an examination of both the specific provision in question and the statutory scheme as a whole. Congress' purpose in enacting NEPA, as stated in § 101 of the Act, was "to use all practicable means and measures" to create and maintain a productive harmony between man and his environment by improving and coordinating "Federal plans, functions, programs, and resources" to that end.[19] The Report of the Committee on Interior and Insular Affairs on Senate Bill S. 1075 notes with concern that, whereas "[v]irtually every agency of the Federal Government plays some role in determining how well the environment is managed . . ., many of these agencies do not have a mandate, a body of law, or a set of policies to guide their actions which have an impact on the environment." S.Rep.No. 91–296, 91st Cong., 1st Sess. 9 (1969), 115 Cong.Rec. (Part 14) 19010 (hereinafter *"Senate Report"*). The success of traditional national policies, designed to increase both the production of goods and our gross national product, has been reaped at the expense of an eroding environment. Thus, § 102 of NEPA "authorizes and directs that, to the fullest extent possible[,][20] . . . all

19. The section provides:

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment. 42 U.S.C. § 4331.

20. Judge Wright urgently stressed that this language does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow "discretionary." Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration "to the fullest extent possible" sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts.

agencies of the Federal Government *shall*" develop procedures to ensure the consideration of environmental implications in all planning and decision-making, thereby making "environmental protection a part of the mandate of every federal agency and department." *Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971); *see City of New York v. United States*, 337 F.Supp. 150, 160 (E.D.N.Y.1972) (Three-Judge District Court, Friendly, C.J.); Hearings on S. 1075, S. 237, S. 1752 before Senate Committee on Interior and Insular Affairs, 91st Cong., 1st Sess. 206 (1969) (hereinafter *"Senate Hearings"*); 115 Cong.Rec. (Part 30) 40416 (1969).

During the *Senate Hearings* on the bill, Professor Lynton K. Caldwell of the University of Indiana recognized the need for and urged that the Act contain an "action-forcing, operational aspect" so that, for example, "Federal agencies, in submitting proposals, [would be required to include therein] an evaluation of the effect of these proposals upon the state of the environment . . . ." *Senate Hearings, supra* at 116. This recommendation was incorporated into the Act as § 102(2)(C). See *Senate Report* at 20 (Section-by-Section Analysis, Title 1, Sec. 102) 115 Cong.Rec. (Part 30) 40419–20 (1969); *see Kleppe v. Sierra Club*, 427 U.S. 390, 401, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

Federal agencies have complied with NEPA's mandate to varying degrees, *see, e. g., Chelsea Neighborhood Ass'ns v. United States Postal Serv.*, 516 F.2d 378, 383–86 (2d Cir. 1975); *City of New York v. United States, supra* at 158. The FTC has accepted its obligation to prepare an impact statement when a Commission rule, guide, or legislative proposal or report concerns a matter that significantly affects the environment, 16 C.F.R. § 1.82(a), (b), yet has viewed § 102(2)(C) as plainly inapplicable to

adjudicatory proceedings brought by the Commission.

The breadth of the triggering clause, however, reflects "the Act's attempt to promote an across-the-board adjustment in federal agency decision making so as to make the quality of the environment a concern of *every federal agency.*" *Scientists Inst. for Pub. Info. v. Atomic Energy Comm'n*, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1088 (1973) (emphasis added). Therefore, an agency hoping to except certain of its actions—on their face covered by the section—from the impact statement process bears a heavy burden.

*The Case Law*

The Supreme Court has stated that "NEPA was not intended to repeal by implication any other statute," *United States v. SCRAP*, 412 U.S. 669, 694, 93 S.Ct. 2405, 2419, 37 L.Ed.2d 254 (1973), and that, "where a clear and unavoidable conflict in statutory authority exists, NEPA must give way," *Flint Ridge Dev. Co. v. Scenic Rivers Assoc.*, 426 U.S. 776, 788, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976).[21] *Accord, Colorado Pub. Interest Res. Group, Inc. v. Hills*, 420 F.Supp. 582, 584–85 (D.Colo.1976). Thus, an agency will not be required to prepare an EIS when so doing would be inconsistent with its mandatory duties under a statute.

This can be illustrated best by an examination of cases in which the actions of certain agencies were held exempt from the requirements of § 102(2)(C) of NEPA. Basically, the cases fall into two groups—those dealing with emergency acts or other situations wherein time was of the essence, and those concerning actions taken by the Environmental Protection Agency ("EPA")— and will be treated accordingly.

In *Cohen v. Price Commission*, 337 F.Supp. 1236 (S.D.N.Y.1972) (Weinfeld, J.),

---

*Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n*, 146 U.S.App. D.C. 33, 449 F.2d 1109, 1114 (1971); *see* "Major Changes in S. 1075 as Passed by the Senate," 115 Cong.Rec. (Part 30) 40417–18 (1969);

H.R. Conference Report, 115 Cong.Rec. (Part 29) 39702–03 (1969).

21. The agencies are directed to comply with § 102 of NEPA "to the fullest extent possible." But see note 20 *supra; see* 42 U.S.C. § 4335.

plaintiffs sought a preliminary injunction to restrain transportation-related public agencies from collecting the increased fares and tolls authorized by an order of the Price Commission, on the ground that the Commission failed to prepare an EIS before issuing the order. It therefore was necessary to determine whether "the Price Commission—a temporary agency and one intended to act . . . with dispatch—" *id.* at 1241, was bound by NEPA's mandates. Judge Weinfeld examined the short-range purposes of the Economic Stabilization Act of 1970 ("ESA") and found that the Commission would be defeated in implementing the ESA's program were it required to undergo the lengthy impact statement process before authorizing an increase in the price of goods. His doubt that it was Congress' intent in enacting the ESA to have its executive arm thus rendered limp and ineffectual was reinforced by "the fact that [Congress] freed the Commission of the normal requirements of the Administrative Procedure Act and limited the powers of the courts to issue injunctive relief." *Id.* at 1242 (footnotes omitted). Without holding that the Price Commission was exempt from § 102(2)(C) of NEPA, Judge Weinfeld ruled that the issue "pose[d] a substantial initial barrier to plaintiffs' success upon the trial." *Id.* For this and other reasons, plaintiffs were denied preliminary injunctive relief.

The reasoning of the *Cohen* case was adopted by the District Court for the District of Columbia in *Gulf Oil Corp. v. Simon*, 373 F.Supp. 1102 (D.D.C.), *aff'd*, 502 F.2d 1154 (Em.App.1974). In that case the plaintiff oil company sought to set aside certain Federal Energy Office ("FEO") regulations promulgated pursuant to the Emergency Petroleum Allocation Act of 1973 ("Allocation Act") again on the ground that the agency had not prepared an EIS in connection therewith. Based upon the fact that the FEO was required to promulgate the regulations within fifteen days after the passage of the Allocation Act, 15 U.S.C. § 753(a), the court found an "inherent tension between NEPA and the Allocation Act," at least with respect to the regulations at issue. 373 F.Supp. at 1105. The court resolved the conflict by concluding that an EIS was not required in this instance.

*Flint Ridge Dev. Co. v. Scenic Rivers Assoc.*, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), did not involve the kind of "emergency" legislation found in *Cohen* and *Gulf Oil*; instead, a specific statutory section making time of the essence created "an irreconcilable and fundamental conflict" with § 102(2)(C) of NEPA. *Id.* at 786, 96 S.Ct. 2430. The statute construed was the Interstate Land Sales Full Disclosure Act ("Disclosure Act"), 15 U.S.C. § 1701 *et seq.*, which requires land developers to file with the Department of Housing and Urban Development ("HUD") a statement of record containing information necessary for the protection of purchasers. In order to shield developers from costly delays resulting from the filing requirement, the Act provides that the statement automatically becomes effective on the thirtieth day after filing, unless the Secretary of HUD finds it inadequate. When petitioner Flint Ridge filed a statement of record, the respondents requested that HUD prepare an EIS before permitting the statement to go into effect. When HUD refused, the Scenic Rivers Assoc. brought suit.

The Court found that the Secretary had no discretion to suspend the statement's effective date for any reason other than inadequacy. It followed that § 102(2)(C) was inapplicable because the Secretary could not, consistent with her duties under the Disclosure Act, satisfy the NEPA impact statement requirement.

The other group of cases to be examined involves actions taken by the EPA, "an agency whose raison d'être is the protection of the environment . . . ." *International Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615, 650 n.130 (1973) (Leventhal, J.). The common thread of the cases holding that the EPA, in the promulgation of rules or the approval of state implementing plans, was not bound by § 102(2)(C) of NEPA was that the decision-

making process of the EPA necessarily involved the same environmental considerations as would have been contained in an impact statement. *See, e. g., Environmental Def. Fund v. EPA,* 160 U.S.App.D.C. 123, 489 F.2d 1247, 1257 (1973); *Portland Cement Assoc. v. Ruckelshaus,* 158 U.S.App. D.C. 308, 486 F.2d 375, 384 (1973); *International Harvester Co. v. Ruckelshaus, supra*; *Appalachian Power Co. v. EPA,* 477 F.2d 495, 508 (4th Cir. 1973). In *Portland Cement,* for example, the Administrator of the EPA promulgated, pursuant to § 111 of the Clean Air Act ("CAA"), rules governing the emission of air pollutants from cement plants. The plaintiff cement company sought judicial review of those standards, claiming that the EPA had not complied with § 102(2)(C) of NEPA. The circuit court's holding that an impact statement was not required was bolstered by certain aspects of the legislative history [22] and by the relevant case law, but rested on the finding that § 111 of the CAA, "properly construed, requires the functional equivalent of a NEPA impact statement." *Id.* at 384.

Mindful of the broad sweep of the section's triggering clause as well as the rationale for such an action-forcing provision, courts have refrained from carving out an across-the-board exception for the EPA. In order not to be blinded by the EPA's stated purposes and to ensure that the functional equivalent of an EIS actually takes place, the courts have chosen, instead, to create exceptions on a case-by-case basis. *See, e. g., Portland Cement Assoc. v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375, 380–84 (1973), and authorities cited therein. *But see Buckeye Power, Inc. v. EPA,* 481 F.2d 162, 173–75 (6th Cir. 1973); *Duquesne Light Co. v. EPA,* 481 F.2d 1, 9 (3d Cir. 1973).

The situations presented by the above two groups of cases are clearly distinguishable from the instant suit. Contrary to the Commission's arguments, the FTC's enforcement of the antitrust laws by way of administrative adjudicatory proceedings does not require the same degree of dispatch as does the implementation of the legislation involved in *Cohen, Gulf Oil* and *Flint Ridge.* Antitrust litigation usually is painfully slow and the *Exxon* action promises to be no exception. Indeed, the plaintiffs noted that, at the end of 1974, the Commission projected a trial date of January 1978, more than four years after the commencement of the proceeding.[23]

Nor do the opportunities for environmental consideration in an FTC enforcement proceeding even approach "the functional equivalent of a NEPA impact statement," *Portland Cement Assoc. v. Ruckelshaus,* 486 F.2d at 384, such that literal compliance with § 102(2)(C) might be labeled "a legalism carried to the extreme," *International Harvester Co. v. Ruckelshaus,* 478 F.2d at 650 n.130. In contrast to the procedures undertaken by the EPA in cases holding certain EPA actions exempt from NEPA, there are no FTC regulations mandating consideration of the environmental implications of Commission enforcement proceedings. The FTC argues that respondents may advance their environmental claims at the remedy stage of the proceedings, but this would not be equivalent to compliance with § 102(2)(C). Functional compliance with the impact statement process would require the FTC's consideration of environmental consequences at a time when it could make a difference—prior to the commencement of the proceedings. See notes 15–16 and accompanying text, *supra.*

Accordingly, this Court disagrees with the FTC's interpretation of § 102(2)(C) of NEPA as embodied in § 1.82(d) of the Commission's Rules of Practice and today holds that FTC enforcement proceedings are federal actions subject to § 102(2)(C) of NEPA "when their scope and impact on the

---

22. By contrast, there is nothing in the Act itself or the legislative comments accompanying its passage to suggest that FTC enforcement proceedings are not included within the section's reach.

23. Memorandum in Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment, at 11.

environment are significant." [24] In so doing, the Court is cognizant that its decision runs counter to the opinions of the Council on Environmental Quality ("CEQ") and apparently the only case to have considered the precise issue, *Gifford-Hill & Co., Inc. v. FTC,* 173 U.S.App.D.C. 135, 523 F.2d 730, 733 n.7 (1975) (per curiam), *aff'g* 389 F.Supp. 167 (D.D.C.1974).[25]

■ The CEQ was established pursuant to Title II of NEPA, 42 U.S.C. §§ 4341–47, and is charged with, *inter alia,* studying the activities of the federal agencies as they relate to NEPA. Pursuant to that authority, as well as § 203(d) of the Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4372(d) and § 3(a), (h) of Executive Order 11514, March 5, 1970, 35 Fed.Reg. 4247 (42 U.S.C. § 4321, at 413); *see Warm Springs Dam Task Force v. Gribble,* 417 U.S. 1301, 1309–10, 94 S.Ct. 2542, 41 L.Ed.2d 654 (1974) (Douglas, J. as Circuit Justice), the CEQ issued an Advisory Memorandum on the "Application of the National Environmental Policy Act to Enforcement of the Anti-Trust Laws by the Federal Trade Commission" ("Advisory Memorandum").[26] Accordingly, the Council's opinions should not be lightly disregarded. *EDF v. TVA,* 468 F.2d 1164, 1177–78 (6th Cir. 1972).

The CEQ concluded in its Advisory Memorandum that the environmental impact process was inapplicable to FTC antitrust proceedings and that, therefore, § 1.82(d) of the Commission's Rules of Practice was consistent with NEPA. That conclusion stemmed from the Council's rejection of what it articulated as the two possible rationales for holding otherwise:

> First an impact statement should be required to determine whether a statutory prohibition should be condoned, or allowed to continue, because of the potential environmental harm from remedying the violation. Or second, an impact statement should be required because alternative solutions exist to remedy the alleged violation, and the choice among these alternative solutions should depend, at least in part, on a detailed study of their environmental implications.

Advisory Memorandum at 19.

■ The CEQ rejected the first rationale because, in its view, the impact statement process would impede enforcement of the antitrust laws through delays, consumption of resources and a heavy imbalance in the elements of prosecutorial discretion. The Council recognized that the delay and increased cost of administrative action occasioned by compliance with § 102(2)(C) was not in and of itself sufficient justification for an exception, but deemed this inconvenience "particularly important in certain law enforcement situations, where the government must be able to negotiate and to act quickly," *id.* at 20. The need for prompt action in antitrust prosecutions, which premise itself may be questioned,[27] however, does not qualify as a statutory man-

---

**24.** Plaintiffs' Statement Pursuant to Local Rule 9(g) ¶ 12, at 3.

**25.** The circuit court affirmed the denial of preliminary injunctive relief "[w]ithout considering the merits of the NEPA complaint . . ." 523 F.2d at 731. Having decided that plaintiffs lacked standing to press NEPA claims and that their suit was premature, it was unnecessary to reach the issue whether FTC enforcement proceedings are included within § 102(2)(C) of NEPA. Nonetheless, the circuit court noted:

> We recognize that our holding effectively means that an agency's decisions to institute adjudicatory proceedings, and *a fortiori* its decisions to institute investigations to determine whether adjudication is warranted, are outside the scope of NEPA. Since these decisions in no way foreclose the agency from considering environmental factors before

making a final decision to require some action, we are convinced that this result is proper. The decision to investigate or to adjudicate does not involve the type of "irretrievable commitment of resources" which NEPA insists must follow rather than precede consideration of environmental factors.

523 F.2d at 733 n.7, *quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,* 156 U.S.App.D.C. 395, 481 F.2d 1079, 1098 (1973).

To the extent that the above language of *Gifford-Hill* is inconsistent with today's holding, the Court declines to follow it.

**26.** The memorandum, prepared at the request of the FTC, was triggered by the action in *Gifford-Hill* and was issued while the case was pending before the appellate court.

**27.** See text accompanying note 23 *supra.*

date so as to render the dictates of NEPA inconsistent with superceding statutory authority. *Compare Flint Ridge Dev. Co. v. Scenic Rivers Assoc.*, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976); *Gulf Oil Corp. v. Simon*, 373 F.Supp. 1102 (D.D.C.), aff'd, 502 F.2d 1154 (Em.App.1974); *Cohen v. Price Comm'n*, 337 F.Supp. 1236 (S.D.N.Y. 1972) (Weinfeld, J.). And the law is clear that, absent a clash of statutory authority, increased cost or delay does not excuse the impact statement requirement. *See Natural Resources Def. Council, Inc. v. United States Nuclear Reg. Comm'n*, 539 F.2d 824, 843 (2d Cir. 1976); *Greene County Planning Bd. v. FPC*, 455 F.2d 412, 422–23 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1128 (1971). In *Greene County, supra* at 422–23, Chief Judge Kaufman stated:

> Fully recognizing that delay unfortunately is incident to our mandate and [the Power Authority of the State of New York's] claim that the Blenheim-Gilboa Project is a vitally needed power facility, we can only add our voice to that of the District of Columbia Circuit in *Calvert Cliffs'*: Delay is a concomitant of the implementation of the procedures prescribed by NEPA, and the spectre of a power crisis "must not be used to create a blackout of environmental consideration in the agency review process." 449 F.2d at 1122.

Similarly, the Court finds unpersuasive the CEQ's argument that application of § 102(2)(C) to enforcement proceedings would create an imbalance in agency decision-making. Prosecutorial discretion involves a complex mix of discrete factors; after the passage of NEPA, the addition of the "environmental" ingredient of course changed the composition of the mix but did not eliminate any of the other factors. The fact that this "environmental" ingredient is the product of a more lengthy and formal process does not necessarily give it the dominating effect feared by the CEQ.

The CEQ also contends that compliance with § 102(2)(C) of NEPA would cause unproductive litigation because, "[i]n many, if not most, cases, the proposed defendant would find it in his best interest to litigate whether an impact statement should be prepared, and if one was prepared, the adequacy of the agency's environmental analysis." Advisory Memorandum at 21–22. Recognizing that the possibility of litigation by a party adversely affected by agency action is a by-product of the section, the Council nonetheless argued that in antitrust enforcement proceedings "this incentive to sue would lie with the party able to structure, at least in a divestiture case, the environmental consequences that might result from the divestiture." *Id.* at 22.

Without regard to the validity of this argument in a proper case, it is simply inapposite here. The environmental consequences of the proposed relief in *Exxon* will occur if the FTC is successful in attaining the remedies it seeks. The environment will be affected by virtue of the administrative order, not independent actions undertaken by the *Exxon* respondents.

In rejecting the second rationale for the applicability of § 102(2)(C) to FTC enforcement proceedings, the CEQ found of great significance the fact that "many of the objectives underlying the impact statement process will frequently be achieved in a law enforcement adjudicatory proceeding, even without a formal requirement for an impact statement." *Id.* at 23. This conclusion seems to be based upon two propositions of doubtful validity: (1) that the FTC voluntarily will consider the environmental consequences of its actions; and (2) that an environmental analysis filed by respondents at the remedy stage of an enforcement action will contribute significantly to the formulation of an ultimate remedy.

The applicability of the Council's first postulate is severely undercut by the language of § 102(2)(C)—the "action-forcing" provision of NEPA—and the reasons for its addition to the Act. The difference between the general directives of § 101 of

NEPA and the specific mandates of § 102 was articulated by Judge Wright:

> Unlike the substantive duties of Section 101(b), which require agencies to "use all practicable means consistent with other essential considerations," the procedural duties of Section 102 must be fulfilled to the "fullest extent possible." This contrast, in itself, is revealing. But the dispositive factor in our interpretation is the expressed views of the Senate and House conferees who wrote the "fullest extent possible" language into NEPA. They stated:
>
> > ". . . [T]he language in section 102 is intended to assure that all agencies of the Federal Government *shall* comply with the directives set out in said section 'to the fullest extent possible' under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance."

*Calvert Cliffs', supra,* 449 F.2d at 1114–15 (footnotes omitted) (emphasis added); see note 20, *supra.* The effectiveness of NEPA was not left to the vagaries of voluntary compliance.

The CEQ's second premise also must fall. The Council itself has recognized the importance of preparing and circulating draft environmental impact statements "early enough in the agency review process before an action is taken in order to permit meaningful consideration of the environmental issues involved." *Greene County Planning Bd. v. FTC, supra,* 455 F.2d at 421, *quoting* 36 Fed.Reg. 7724 (April 23, 1971). This Court already has noted that at the relief stage of an enforcement proceeding there is too great a tendency to accept as inevitable adverse environmental consequences, thereby nullifying their input into the decisionmaking process.

Moreover, without being subject to the dictates of § 102(2)(C), there is a danger that the Commission will wrongly assume that enforcement proceedings are exempt as well from the more general directives of NEPA. Under such circumstances, the FTC will have no incentive to heed the respondents' warnings concerning the environment, assuming that its sole mission is to enforce the antitrust laws, and the very purpose of NEPA will have been defeated.

### CONCLUSION

Wary that the federal agencies would not implement the policies of NEPA on their own, Congress inserted an "action-forcing" provision into the Act. Viewed in this light, the CEQ's arguments against its applicability to FTC enforcement proceedings seem naive at best. The weight attached to the CEQ's opinion must not override the fulfillment of judicial responsibility "to see that important legislative purposes, heralded in the halls of Congress, are not lost or misdirected in the vast hallways of the federal bureaucracy." *Calvert Cliffs', supra,* 449 F.2d at 1111.

■ The Court recognizes that its ruling today may signal an occasional decision not to prosecute antitrust violators for the sake of preserving our environment. It must be remembered, however, that the decision whether to go forward notwithstanding adverse environmental impact rests with the Commission. It is their obligation, not the Court's, to weigh alternatives. In the rare case where the FTC determines that the severity of the offense does not justify the environmental cost of remedying it,[28] no doubt we all will be better off bearing with the noncompetitive effects rather than paying for competition with our natural resources. Federal agencies often have to choose among evils. NEPA was de-

---

**28.** That such a situation would be rare indeed finds support in the CEQ's Advisory Memorandum:

> We find it difficult to imagine a proposed divestiture case under the Clayton Act or the Federal Trade Commission Act where the likely environmental consequences would be so significant to justify subjecting the decision on whether to prosecute to the requirements of the impact statement process.

Advisory Memorandum, at 21. The Council somehow sees in the infrequency of environmental impact a justification for foregoing the process entirely.

Section 102(2)(C) is not aimed at providing busywork for federal agencies: where agency action obviously has no environmental impact, compliance involves no more than making that initial determination.

signed to inject environmental consequences into that equation.

■ Accordingly, § 1.82(d) of the FTC's Rules of Practice, which purports to withdraw a substantial part of the Commission's activities from the scope of § 102(2)(C) of NEPA, is hereby declared null and void. Additionally, since the relief proposed in *Exxon* would operate to "restructure the petroleum industry and alter the manner in which oil, a depletable natural resource,[29] is produced, distributed and used," [30] the Court finds that *Exxon* is a "major federal action significantly affecting the quality of the human environment" as that phrase is used in § 102(2)(C) of NEPA.[31] The FTC does not really dispute this. Pursuant to this grant of summary judgment in favor of the plaintiffs, Fed.R.Civ.P. 56, the Commission is hereby ordered immediately to begin compliance with the section's mandate by preparing a draft environmental impact statement.

SO ORDERED.

**29.** *See National Helium Corp. v. Morton,* 455 F.2d 650, 656 (10th Cir. 1971).

**30.** Memorandum in Support of Plaintiffs' Motion for Summary Judgment, at 36.

**31.** See text accompanying notes 7–10 *supra.* The Court recognizes that the test for determining plaintiffs' standing to raise NEPA claims—environmental injury in fact—lacks the element of magnitude written into the standard for deciding whether a particular agency action necessitates the filing of an EIS. In this case, however, plaintiffs' arguments in favor of their standing reveal not only that the Commission's proposed relief would affect the environment but that this effect would be significant.